NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BISCUIT AND CRACKER WORKERS
LOCAL UNION NO. 405, A.F.L.,
Respondent.

No. 247, Docket 23361.

United States Court of Appeals
Second Circuit.

Argued April 6, 1955.
Decided May 18, 1955.

David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, James A. Ryan, Attys., N. L. R. B., Washington, D. C., for petitioner.

Kalman Sklar, New York City, for respondent.

Before HAND, SWAN and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

This petition is brought by the National Labor Relations Board for enforcement of its order against the respondent Union. The Union was charged with having committed an unfair labor practice under Sections 8(b) (1) (A), 29 U.S.C.A. § 158(b) (1) (A), and 8(b) (2), 29 U.S.C.A. § 158(b) (2), of the Labor Management Relations Act,[1] in causing the National Biscuit Company to discharge Frank Borg, one of the Biscuit Company employees. The Trial Examiner found and the Board held that the insistence of the Union upon Borg's discharge was an unfair labor practice under the above cited sections on the theory that such action constituted unlawful "discrimination" and was not, as the Union contends, the result of Borg's delinquency in paying dues. The Board entered a cease and desist order and required the Union to inform both Borg and the Company that it had no objection to his immediate reinstatement. Further, the Board ordered the Union to make Borg whole for any loss of earnings incurred as a result of the Union's unfair labor practice. The order, among

---

1. Section 8(b) (1) (A) provides:
    "It shall be an unfair labor practice for a labor organization or its agents—
    "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances".

29 U.S.C.A. § 158(b) (1) (A).
    Section 8(b) (2) provides:
    "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership". 29 U.S.C.A. § 158(b) (2).

other things, also requires the Union to post notices.

The facts as found fully support the decision of the Board. They are as follows. The Company and the Union entered into a collective bargaining agreement which has, since at least 1949, contained a Union security clause. This clause provides that, " * * * all new employees hired by the Company after the effective date of this agreement shall make application for membership with and join the Union on the thirtieth (30th) day from the date of employment." The provision also requires that all new and present employees of the Company remain "members of the Union in good standing" during the life of the collective agreement. Compliance with the provision is made a condition of employment.

The term "good standing" is not defined in the contract itself but the laws of the Union provide that suspension from the Union entails loss of "good standing." And a member is automatically suspended if his dues and/or assessments are in arrears for more than two months. If the delinquency continues for more than six months the member can be expelled. Expulsion, however, differing from suspension, is not made automatic for failure to pay dues. Expulsion is permissible after a six-month dues delinquency if the Union authorities deem such action appropriate.

The practice of the local Union in enforcing the clause is significant. Once every few months the Union compiles a list of employees who have failed to pay dues for more than two months. This list, which frequently contains as many as sixty names, is sent to the company personnel officer with an accompanying letter requesting the Company to notify the delinquent employees immediately. Theoretically, at least, all of the employees on this list are, under the laws of the Union discussed above, automatically suspended and consequently without "good standing" in the Union. Under the security clause in the bargaining contract the Union had a right to insist that each be discharged from the Company's employ but it is undisputed that the general practice was that such letters to the Company did not contain that demand.[2]

On receipt of such a letter the practice was for the Company to notify the employees concerned. If any employee thereafter failed to pay his back dues, his name was included in a second list which was sent to the Company with a letter directing that he be not "permitted to work until further notice from Local 405."

The invariable practice of the Union has been, except in the instant case, to accept a tender of back dues from a delinquent employee. The Union's practice, moreover, has been to accept back dues even after they have made a demand on the Company to discharge the delinquent. Once the back dues are paid, the Union, without requiring the employee to apply for reinstatement or to take any other affirmative action, treats the delinquency as cured and abandons insistence that the employee be discharged. This practice which we have outlined has proved so effective in collecting back dues that Borg appears to have been the first em-

2. The trial examiner found that these letters are substantially as follows:

"We hereby notify you that the following employees have failed to pay or tender payment of union dues which were due on or before this date. The failure to make said payment or tender thereof, renders them liable to discharge in pursuance of the union shop provision of our collective bargaining agreement.

"Please notify these employees immediately of their delinquency. Without waiver of the union's right to enforce the union shop provision of our agreement, allow them a period of four (4) days to correct their delinquency.

"We will advise you further whether discharge from their respective jobs is required, depending upon the nature of their response to this notice.

"In the meantime, please keep this notice on file."

ployee in the history of the bargaining relations between the Company and this Union to be discharged on the purported ground of failure to pay dues.

Borg was hired by the Company on June 4, 1952. In compliance with the contract he became a member of the Union. From June 1952, until January 1953, he was not delinquent in the payment of his Union dues. In the latter part of January he became ill. From then until June 9 he was unable to work and did not report for work. From February until June, though still an employee of the Company, he failed to pay his Union dues. On April 22, the Union sent the Company a list of employees who were at that time delinquent in their dues for more than two months. Borg's name was on the list and the Company reported to the Union that he had been absent from work for fifty days.

On June 10th, Borg went to the Union office to inquire about sick benefits under an insurance plan administered by the Union. He was told by a clerk that he was not entitled to sick benefit payments, because, under the laws of the Union, such payments were payable only to employees in "good standing" in the Union and it was explained that Borg's delinquency in the matter of dues deprived him of the requisite standing. Borg became angry and called the Union a "swindle" and stated that he did not want to belong to the Union. Borg left the office and, after consulting with the Union president, the treasurer of the Union contacted the Company personnel officer and instructed him that Borg, because of his arrears in dues, should not be allowed to return to work without approval from the Union. The personnel officer considered this message the equivalent of the second letter under the above described procedure.

On June 15, pursuant to the advice of the Company personnel officer, Borg went back to the Union office. It is undisputed that he made an offer to pay his back dues and that the offer was rejected. In reference to his conduct on June 10th, he said to the Union treasurer: "I know I was a little angry. I am sorry. Maybe I was a little excited. I am here to offer my dues." The treasurer replied that he could not accept the dues and that Borg would have to see the Union president. Borg was told that the president was away and would not be back for ten days. Borg went back to the Union office in about ten days, but was told that he should come in again on the following Friday at 6 P. M. He returned at the designated time and was referred to a Union steward. Again Borg repeated his offer to pay his back dues but the steward replied that he was "released" and that the Union could not accept him in the shop. At this point the conversation was concluded and Borg did not return to the plant thereafter. On July 3 the personnel officer was advised by the Union that Borg "had not made any satisfactory arrangements with the Union regarding his back dues and should be released." The Company immediately discharged Borg on the ground of "non-payment of Union dues."

■ Whether the Union action in causing Borg's discharge was an unfair labor practice is the immediate question. In the determination of that question, we must accept all the findings of fact, as above summarized, made by the administrative agency. For they were all, when the record is viewed as a whole, supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040.

Under Section 8(b) (2) of the Act, it is an unfair labor practice if a Union causes an employer to violate Section 8(a) (3). And an employer violates Section 8(a) (3) if he discriminates against an employee for nonmembership in a labor organization when the employer has "reasonable grounds for believing" that "such membership was not available to the employee on the same terms and conditions generally applicable to other members," and that "membership was denied or terminated for reasons other than the failure of the

employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership". Section 8(b) (2), moreover, makes it an unfair labor practice for a Union to discriminate against an employee whose membership in the Union has been terminated "on some ground other than his failure" to pay dues and initiation fees.

It is clear that the Union could, by invoking the security clause, insist on Borg's discharge only on the ground that Borg had failed to pay his Union dues. Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 40-42, 74 S.Ct. 323, 98 L.Ed. 455. If a Union expels or suspends a member solely on the ground that he is indifferent to the Union, or disagrees with some internal Union policy, or is outspoken in his distaste for the Union or for the concept of unionism itself, it may not, under the theory of the last cited case, thereafter invoke the security clause in the collective bargaining contract to obtain the employee's discharge.

The facts of this case leave no room for doubt that the Union caused Borg's discharge not for his failure to pay Union dues—though concededly his dues were in arrears—but solely because of his outburst in the Union office on June 10 when he was refused payments under the Union's sick benefit plan. Assuming that the refusal of sick benefits was in all respects valid, and assuming that the Union was entitled to expel him because of this outburst, his loss of membership for such a cause did not warrant Union action in depriving him of his employment. Such action was plainly proscribed by the Act. Indeed, it was violative of the generally prevailing mores of a democratic community.

The Union contends that Borg was "expelled" for failure to pay dues for five months. It has already been established that such expulsion was entirely inconsistent with existing practice. Moreover, our attention has not been directed to a local union rule which authorized expulsion for arrears in dues. The only rule on the subject appears to be that of the International Union which provides that a member may be expelled for failure to pay dues for more than six months. We conclude that the Union did violate Section 8(b) (1) (A) and Section 8(b) (2) when it caused Borg's discharge.

The Trial Examiner also held that the Union security clause was invalid. The Board did not pass on that point, but held that the Union's action in this case would violate the above sections of the Act even though the security clause was valid. We agree with the disposition made by the Board and refrain from passing on the validity of the security clause in the collective bargaining contract.

The petition for enforcement is granted.