The **INTERNATIONAL ASSOCIATION OF MACHINISTS, AFL–CIO,** and **Lodge 1021, International Association of Machinists, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 300, Docket 24385.**

United States Court of Appeals Second Circuit.

Argued April 9, 1957.

Decided Aug. 2, 1957.

Plato E. Papps, Washington, D. C., Sturm & Perl, New York City, for petitioners.

Kenneth C. McGuiness, General Counsel, Stephen Leonard, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Margaret M. Farmer, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Clarence M. Mulholland, Toledo, Ohio, Edward J. Hickey, Jr., Washington, D. C. (Mulholland, Robie & Hickey, Washington, D. C., of counsel), for Railway Labor Executives' Ass'n, amicus curiae.

Before HAND, MEDINA and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

This case is before us upon the petition of the International Association of Machinists, AFL-CIO, and Lodge 1021 of that union, pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C.A. § 160(f), to review and set aside an order of the National Labor Relations Board issued against the petitioners based upon a finding of unfair labor practices committed by them. The Board's decision and order are reported at 116 N.L.R.B. No. 92 (1956). We have jurisdiction under the Act because the conduct found by the Board to constitute unfair labor practices occurred in New Britain, Connecticut, within this judicial circuit.

In 1954 the New Britain Machine Company and the petitioners entered into a collective bargaining agreement, effective for a period of two years, covering a production and maintenance unit. The agreement contained a union security provision requiring employees who were union members to "maintain their membership in the Union in good standing" during the life of the agreement as a condition of their continued employment. A member's failure to maintain such a status would entitle the union to request his discharge by the company. The maintenance of membership provision contained the following proviso:

"* * * provided, however, there shall be during the period of this contract, annual escape periods from March 7 to March 22 inclusive, within which escape periods any Union member may resign from the Union and be relieved of the obligations of maintenance of membership by written notice to both the Union and the Company indicating such resignation, and such notice shall also operate as a simultaneous revocation of the employee's checkoff authorization under 4.3."

Edward Batogowski was an employee of the New Britain Machine Company and a union member who had signed a checkoff authorization. By letter dated March 21, 1955, Batogowski notified the Company that he was resigning that day from the union. The Company removed Batogowski's name from the checkoff list. It then, in April, 1955, sent to Lodge 1021 a list of those employees who had canceled their checkoff authorizations, including Batogowski. Batogowski made no dues payments to the union after his letter to the Company.

On May 17, 1955, the recording secretary of Lodge 1021 wrote Mr. Morrow, a vice-president of the Company in charge of industrial relations, informing him that the union had "received no official notification" of resigning and checkoff cancellation from Batogowski or from John Stochmal, another employee whose name had been placed on the list sent to the union in April. The letter of the recording secretary then directed the Company's attention to the requirement in the bargaining agreement that *both* the Union and the Company must receive written notice of a union member's resignation during an escape period in order for that resignation to be effective. On May 26 the Company official replied, stating that the

Company had "investigated these two cases and is satisfied that the notices to the Union were properly placed in mail channels to the Union," and asserted that proper mailing of the notice by the employee was sufficient compliance with the requirements of the escape period provision.

The collective bargaining agreement contained provisions for a grievance procedure, with ultimate resort to arbitration of any unsettled issues. Sometime during May 1955, a grievance meeting was held. At the hearing before the Trial Examiner of the NLRB the union representative testified that at this meeting he told Morrow that the union had not received notices from the two employees, and that under the union constitution these employees would cease to be "members in good standing" after the lapse of a 90-day grace period measured from March 1, 1955, the date at which the employees' obligation to tender the first unpaid installment of dues arose. The union representative further testified that at this May meeting he stated that if the two employees paid their back dues, the union would consider the matter closed. The Company adhered at that time, however, to its interpretation of the collective bargaining agreement and its contention that the two employees had sufficiently complied with the resignation provisions. Unsatisfied with this position, the union filed a formal grievance with the Company on June 16, 1955, at which time neither Batogowski nor Stochmal had tendered any back dues. It was the union's claim that the attempted resignations were ineffective and therefore the two employees were no longer "members in good standing." The grievance was considered by a Company official, who after a further examination upheld the Company's original position. The grievance remained unresolved, however, and the parties resorted to arbitration.

Sometime after June 20 but before the parties resorted to arbitration in August, Stochmal tendered his back dues, which were accepted by the union,

and thus that employee was restored to the status of a "member in good standing." There was evidence at the hearing held by the Trial Examiner of the NLRB tending to show that sometime prior to the arbitration hearing the union requested that the Company discharge Batogowski because he was no longer a "member in good standing."

The issue originally submitted for arbitration was framed as follows: "Did Employee Edward Batogowski resign from the Union membership and revoke his checkoff authorization under Article IV of the Contract?" The parties later agreed to add the following question to the statement of the issue: "And if not, (to) what remedy, if any is the Union entitled under the Contract?"

The arbitrators held their hearing in the latter part of August and handed down their decision on November 23, 1955. This decision, written by the "third arbitrator" and concurred in by the arbitrator selected by the union, stated that Batogowski's attempted resignation was ineffective because they found that no notice thereof was received by the union. The award of the arbitrators reads as follows:

> "Employee Edward Batogowski did not resign from the Union and revoke his checkoff authorization in accordance with Article IV of the Contract.

> "The Union is entitled under the Contract to require the discharge of Edward Batogowski."

Morrow learned of the award on the same day it was made. He immediately summoned Batogowski to the office, told him of the award, and suggested that he pay his back dues. Batogowski sent Lodge 1021 a note on that very day— November 23—stating that he was enclosing a money order for $20 "representing arrears in dues as of today. If [there is] any monetary difference as to the accuracy of my calculation, please let me know promptly, as it is my desire to pay my dues in full." It was stipulated before the Trial Examiner that

Batogowski tendered the full amount of his back dues.

At a meeting of Lodge 1021 held on December 1, 1955, the members voted not to accept Batogowski's tender of dues, and the treasurer returned the money order to him. On December 6, the recording secretary wrote Morrow advising him of the union's decision and requesting that the Company discharge Batogowski.[1] Morrow rejected this request and set forth the company's reasons for so doing.[2] In the ensuing weeks the union repeated its request, but the Company stated that it would discharge Batogowski only when it was assured that it would not be committing an unfair labor practice thereby or depriving Batogowski of his legal or contractual rights.

The Union representatives continued to press their demand for Batogowski's discharge. Finally, at a meeting with Morrow on February 1, 1956, they threatened a strike unless their demand was met. The next day Morrow apprised Batogowski of the union's stand, and informed him that his employment was terminated. On the same day Morrow notified the NLRB of the Company's decision to discharge Batogowski and the circumstances prompting this action. The Company also charged the union with the commission of unfair labor practices in requesting Batogowski's discharge and in threatening to strike if the request were not granted. A complaint was issued, and the NLRB took jurisdiction.

On these facts, the Board found that the union had violated sections 8(b) (1) (A)[3] and 8(b) (2)[4] of the Act by "unlawfully demanding the discharge of Edward Batogowski." In addition to the usual cease and desist order, the Board ordered the reinstatment of Batogowski, with back pay damages, if any, to be borne by the petitioners.

1. That letter read as follows:
 "At the regular Lodge membership meeting held in the Lodge Hall at 434 Main Street, in New Britain, on December 1, 1955, the award of the Arbitrators on the Arbitration between the New Britain Machine Company and the International Association of Machinists Lodge No. 1021, regarding employee Edward Batagowski was read and thoroughly discussed. It was voted unanimously by all the members present at the meeting that the Lodge abide by the Arbitrators decision of November 23, 1955 on Edward Batagowski.
 "We request that Edward Batagowski be discharged under Article IV in the Contract between the New Britain Machine Company and the International Association of Machinists and Lodge No. 1021, IAM, dated March 22, 1954."

2. That letter, dated December 12, 1955, insofar as here relevant, read as follows:
 "The Company understands that subsequent to the arbitration award, Edward Batogowski made full tender of back dues to the Union. In view of this fact, the Company may not legally discharge Mr. Batogowski for non-payment of Union dues. Under a recent decision of the National Labor Relations Board, both the Company and the Union would be subject to an unfair labor practice charge

if the Company were to discharge Mr. Batogowski now. We refer you to the case of Aluminum Workers, A. F. of L., decided by the NLRB on May 6, 1955, and reported at 36 LRRM 1077 * * *".

3. Section 8(b) (1) (A) provides:
 "(b) It shall be an unfair labor practice for a labor organization or its agents—
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *".

4. Section 8(b) (2) provides:
 "(b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * *
 "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

The Board reasoned that although the petitioners were entitled to request Batogowski's discharge at the time of the arbitration award on November 23, 1955,[5] Batogowski had "made a full and unqualified tender of back dues *after* the arbitration decision had been announced and *before* the actual discharge had taken place." Therefore the petitioners, subsequent to that tender, "were no longer privileged to lawfully require Batogowski's discharge." In support of this analysis, the Board relied on the following broad language in its own opinion in Aluminum Workers International Union, Local No. 135, AFL, 112 N.L.R.B. 619, 621 (1955), enforcement granted, N. L. R. B. v. Aluminum Workers International Union, 7 Cir., 1956, 230 F.2d 515:

> " * * * a full and unqualified tender made anytime prior to actual discharge, and without regard as to when the request for discharge may have been made, is a proper tender and a subsequent discharge based upon the request is unlawful."

We reverse the Board's order and decision finding the petitioners guilty of unfair labor practices under sections 8 (b) (1) (A) and 8(b) (2). We believe that the quoted language from the Board opinion in the Aluminum Workers case is an incorrect statement of the law.[6] We are therefore remanding this case for further proceedings to ascertain the reason or reasons motivating the requests for Batogowski's discharge that were made by the petitioners subsequent to November 23.

The legislative intent embodied in sections 8(a) (3) [7] and 8(b) (2) of the National Labor Relations Act was examined and discussed by the Supreme Court in considerable detail in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N. L. R. B., 1954, 347 U.S. 17, 40–41, 74 S.Ct. 323, 335, 98 L.Ed. 455: [8]

> " * * * The policy of the Act is to insulate employees' jobs from their organizational rights. Thus §§ 8(a) (3) and 8(b) (2) were designed to allow employees to freely

5. At the hearing below the parties stipulated that " * * * the question of whether or not Batogowski sent a proper resignation to the union * * * " is not an issue in this proceeding, having been resolved by the same parties through the arbitration proceeding. In its opinion the Board characterized the arbitration decision in this case "as a fair and voluntary settlement of the factual issues presented in that proceeding." The Board then relied upon its decision in Spielberg Mfg. Co., 112 N.L.R.B. 1080, 1082 (1955), where it said, " * * * the desirable objective of encouraging the voluntary settlement of labor disputes will best be served by [the Board's] recognition of the arbitrator's awards." Thus the arbitration decision was not disputed on appeal.

6. On appeal, the Court of Appeals for the Seventh Circuit based its affirmance on two grounds, neither of which involved the broad rule set forth by the Board. See N. L. R. B. v. Aluminum Workers International Union, 7 Cir., 1956, 230 F.2d 515. The court held that on the particular facts of that case the employee's tender of dues was timely, and that in any event it was made prior to the union's "operative demand" for the employee's discharge. The court also queried the union's reason for requesting the discharge, suggesting that it was based on some other ground than nonpayment of dues.

7. Section 8(a) (3), insofar as here relevant, reads as follows:
 * * * *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization * * * if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

8. See also the remarks of the late Senator Taft made on the Senate floor while the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., was in the course of enactment. E. g., 93 Cong.Rec. 3827; 93 Cong.Rec. 3953 (1947); 93 Cong.Rec. 4317–4318 (1947); 93 Cong.Rec. 4887; 93 Cong. Rec. 5087–88 (1947). See S.Rep. No. 105, 80th Cong., 1st Sess. 6–7 (1947); Legislative History of the Labor Management Relations Act, 1947, pp. 412–413, 1010, 1096.

exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood. The only limitation Congress has chosen to impose on this right is specified in the proviso to § 8(a) (3) which authorizes employers to enter into certain union security contracts, but prohibits discharge under such contracts if membership 'was not available to the employee on the same terms and conditions generally applicable to other members' or if 'membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership'. Lengthy legislative debate preceded the 1947 amendment to the Act which thus limited permissible employer discrimination. This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of unions' concern about 'free riders,' i. e., employees who receive the benefits of union representation but are unwilling to contribute their share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. Thus an employer can discharge an employee for nonmembership in a union if the employer has entered a union security contract valid under the Act with such union, and if the other requirements of the proviso are met. No other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned."

Under the applicable language of section 8(b) (2), 29 U.S.C.A. § 158(b) (2), a labor organization commits an unfair labor practice only if it causes an employer "to discriminate against an employee with respect to whom membership in such organization has been denied or terminated *on some ground other than his failure to tender the periodic dues * * * uniformly required as a condition of * * * retaining membership."* (Emphasis added.) The petitioners here argue that there was no finding by the Board that their request for Batogowski's discharge was motivated by anything other than that employee's failure to tender his periodic dues. To this contention the Board replied that the requests for Batogowski's discharge that were made on December 6, 1955, and thereafter, *must have been* motivated by some other reason because Batogowski had tendered the full amount of accrued back dues to the union on November 23, 1955—the day of the arbitration award. Moreover, the Board argues, the Company would have committed an unfair labor practice if it had acceded to the union's request for Batogowski's discharge prior to the outcome of the arbitration, because the Company until that time would have had "reasonable grounds for believing that Batogowski's union membership was * * * terminated for reasons other than [his] failure * * * to tender the periodic dues. * * *" 29 U.S.C.A. § 158(a) (3) (B). That is, until November 23, the Company believed that Batogowski's union membership had been terminated by an effective resignation during the "escape period."

But, answer the petitioners, even if the Company was entitled to deny the union requests for Batogowski's discharge made prior to the outcome of the arbitration, the Company was thereafter required to grant the request subsequent to November 23 because on that date the Company learned that Batogowski had not effectively resigned from the union during the preceding March. Thus his subsequent failure to tender the monthly union dues as they fell due deprived him of his status as a "member in good standing" and empowered the union to

request his discharge under the terms of the existing collective bargaining agreement. And, according to the petitioners' reasoning, Batogowski's tender of back dues on November 23 was too late to defeat the union's right to request his discharge, because at that time, under the union constitution, Batogowski had not been a "member in good standing" for almost six months. The underlying theory of this argument is that once the union's right to request an employee's discharge has arisen under the terms of the collective bargaining agreement, it cannot be defeated by a subsequent belated tender of back dues.

We believe that there is considerable merit to the petitioners' contention, and it finds support in at least two of the earlier Board decisions. See Chisholm-Ryder Co., 94 N.L.R.B. 508, 511 (1951); Ferro Stamping and Mfg. Co., 93 N.L.R.B. 1459, 1504 (1951). See generally Note, The Ability of A Union To Cause A Discharge For Nonpayment of Dues Under The Taft-Hartley Act, 45 Geo.L.J. 250 (1956–57). In the Ferro case the Trial Examiner stated that the failure to tender periodic dues "is not automatically canceled·out by a subsequent tender of payment, unless acquiesced in by the union or unless the union's own regulations provide for restitution of membership rights upon correction of the default." 93 N.L.R.B. at 1504. In Chisholm-Ryder the Board applied this principle in holding that a tender of back dues by a union member who was delinquent in his payments did not defeat the union's right to compel that employee's discharge under a union security provision.

 The rationale of the Chisholm-Ryder holding is obvious. If labor organizations are to be allowed effective enforcement of union security provisions, they must be free to invoke the sanction of loss of employment against those union members who are delinquent in tendering their periodic dues. This sanction might become meaningless if an employee could avoid its impact by an eleventh hour tender of back dues just prior to actual discharge. Moreover, an employer might effectively frustrate the expeditious collection of dues by warning recalcitrant employees to tender their dues when the union finally pressed its request for discharge by resort to the NLRB arbitration, or, as here, by threat of strike. It seems clear to us that Congress did not intend that the efficacy of valid union security provisions should depend solely on the employer's willingness to act promptly upon a request for an employee's discharge when the validity of that request is not in issue. Rather, we believe that the employee who is delinquent in paying his union dues is a "free rider," whose discharge can be compelled by the union under an applicable union security provision even though that employee belatedly tenders his back dues in full before actual discharge.[9]

Throughout the proceedings below, counsel for the NLRB, the Trial Examiner, and finally the Board itself relied upon the statement quoted above from the Board opinion in the Aluminum Workers case. Hence neither the intermediate order of the Trial Examiner nor the final decision of the Board contains a finding as to the reason or reasons underlying the requests for Batogowski's discharge made subsequent to his tender of back dues on November 23. We believe that such a finding is crucial in a proceeding involving a charge brought under section 8(b) (2). That is, a violation of that section can be sustained here only upon a finding that the petitioners requested Batogowski's discharge for some other reason "than his failure to tender * * * periodic dues."[10]

9. See Note, The Ability of A Union To Cause A Discharge For Nonpayment of Dues Under The Taft-Hartley Act, 45 Geo.L.J. 250, 259–61, 264 (1956–57).

10. Efforts by a union to procure an employee's discharge for a variety of reasons other than nonpayment of periodic dues or initiation fees have been held to be unfair labor practices. E. g., failure to pay a fine or other assessment, N. L. R. B. v. International Ass'n of Machinists, Local No. 504, 9 Cir.1953, 203 F.

We are therefore remanding this case to the NLRB for further proceedings in order to ascertain whether the demands for discharge made after November 23 were based, even in part, upon some ground other than nonpayment of dues.

In its brief on appeal, the Board compared the union's acceptance of Stochmal's belated tender of dues with its subsequent refusal to accept Batogowski's tender. The Board then argued that the requests for the latter's discharge after November 23 must have been motivated by resentment over his insistence on arbitration rather than by his failure to tender periodic dues. Although on appeal we cannot sustain the finding of unfair labor practices on an inference that was not explored by the triers of fact, we do point out that this comparison in treatment may be relevant to the inquiry for which we are remanding this case. In upholding a Board finding of a section 8(b) (2) violation, this court has given great weight to evidence of any disparity in a union's treatment of different employees, all of whom were similarly delinquent in tendering back dues. See N. L. R. B. v. Biscuit & Cracker Workers, 2 Cir., 1955, 222 F.2d 573, 575–577. Here Batogowski tendered his dues as soon as he was conclusively apprised that he was so obligated. His refusal to tender dues or to permit their checkoff, subsequent to March 1955 but prior to the outcome of the arbitration proceedings, was motivated, from all that appears in the record below, solely by his good faith belief that he was not a member of the union after March and thus was not obligated to tender periodic dues after that date. A finding by the Board that the demands for Batogowski's discharge subsequent to November 23 were prompted, even in part, by union pique over that employee's resort to grievance and arbitration procedures would provide ample basis for concluding that the petitioners had violated sections 8(b) (1) (A) and 8(b) (2). Clearly, Congress never intended that union security provisions could be invoked to penalize an employee whose only "error" was that he insisted on a full exhaustion of procedures expressly provided for in the collective bargaining agreement before he would concede his indebtedness to the union.

Reversed and remanded to the NLRB for further proceedings there in accordance with this opinion.

L. HAND, Circuit Judge (dissenting).

I do not think that the question is here involved whether it is an unfair labor practice for a union to demand the discharge of an employee because he has defaulted in the payment of his dues although he has redeemed his default before the employer actually discharges him. *Arguendo,* I will assume, without expressing any opinion, that such a demand is not an unfair labor practice. In the case at bar I also assume that the union demanded Batogowski's discharge before November 23, 1955, the day when the arbitration award was made and when he redeemed his default. Nevertheless, the union was guilty of a violation of § 8(b) (2) if the strike threat was an attempt—and, as it proved, a successful attempt—to cause an employer "to discriminate against an employee with respect to whom membership * * has been * * * terminated on some ground other than his failure to tender the periodic dues * * * " That in turn depends upon whether the employer had "reasonable grounds for believing

2d 173; Custom Underwear Mfg. Co., 108 N.L.R.B. 117 (1954); Westinghouse Electric Corp., 96 N.L.R.B. 522 (1951); Electric Auto-Lite Co., 92 N.L.R.B. 1073 (1950); affirmed 6 Cir., 196 F.2d 500, certiorari denied 1952, 344 U.S. 823, 73 S.Ct. 23, 97 L.Ed. 641; Pen and Pencil Workers Union, Local 19593, AFL, 91 N.L.R.B. 883, 886 (1950); acceptance of a wage lower than the one estab-lished as union scale, International Brotherhood of Teamsters, AFL, 110 N.L.R.B. 287 (1954); activities in a rival union, Wagner Iron Works, 104 N.L.R.B. 445, 450 (1953); failure to attend union meetings, Hunkin-Conkey Constr. Co., 95 N.L.R.B. 433, 436 (1951); circulating a petition criticizing the method of selecting a shop steward, Air Products, Inc., 91 N.L.R.B. 1381 (1950).

that membership was * * * terminated for reasons other than the failure of the employee to tender the periodic dues * * * " My brothers hold that the evidence requires some finding by the Board whether the demand for Batogowski's discharge may not in some degree have been a reprisal for his insistence that he had given notice of resignation. To this I agree and I should concur in their opinion—as indeed *pro tanto* I do—were it not that I think for other reasons that the union's demand was for a violation by the employer of the second proviso of § 8(a) (3).

It may be that in fact the union's only motive for terminating Batogowski's employment was because of his failure to pay his dues—that, as I have just said, remains an issue to be decided. If the words "terminated for reasons other than" etc. are to be confined to the union's motives I should agree that that was the only issue. So to confine them does not, however, appear to me necessary, or indeed their right interpretation. No one would argue that, if the employee did not in fact owe the dues, the union's demand, although made in entire good faith, would require the employer to "discriminate" against him. The dues must be valid claims, and when the proviso declared that the employer should be free to discriminate if he had "reasonable grounds for believing that membership was * * * terminated for reasons other than the failure * * * to tender the periodic dues," the right interpretation seems to me to be that his grounds for believing that the employee owes the money are among the factors that should determine his belief about the reasons for the termination. In the case at bar there was nothing to cause the employer to suspect that Batogowski had not mailed the notice, or for that matter that mailing alone was not enough. To subject it to a strike because it waited until that issue was determined by an arbitration, to which the union had itself consented, appears to me unduly and most unfairly to circumscribe the latitude that the proviso granted it. For that reason I would affirm the order.