**Barbara Ann BRADY, Plaintiff,**

v.

**LOCAL 551, AIR TRANSPORT DIVISION, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Arthur Teolis and Vera Trolf, Defendants.**

**No. 76 Civ. 138.**

United States District Court,
S. D. New York.

Oct. 25, 1977.

Milton Horowitz, New York City, for plaintiff.

O'Donnell & Schwartz, New York City, for defendant Local 551; Malcolm A. Goldstein, New York City, of counsel.

Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., Joel Field, New York City, local counsel, for defendants Teolis and Trolf.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This action was brought under Section 102 of the Labor-Management Reporting and Disclosure Act of 1959, as amended, 29 U.S.C. § 412 ("LMRDA"), seeking monetary and injunctive relief for the allegedly wrongful termination of plaintiff's membership in defendant Local 551, Air Transport Division, Transport Workers Union of America, AFL–CIO ("the Union"). The individual defendants Teolis and Trolf were officers of the Union at the time at which the acts complained of occurred. Presently pending are defendants' motion for summary judgment and plaintiff's motion for a preliminary injunction, which, upon request of plaintiff's counsel, will be considered initially in opposition to defendants' summary judgment motion, and in support of partial

**1192**

summary judgment in plaintiff's favor on the issue of liability.[1]

The flight attendants at Trans World Airlines, Inc. ("TWA"), as represented by the Union, and TWA are parties to a collective bargaining agreement, governing wages and working conditions. Article 22 of this agreement, commonly known as the union security clause, provides that as a condition of continued employment, the flight attendant must maintain "membership in good standing" in the Union, defined as the payment of union dues by the flight attendant within two months after the calendar month in which they are due. Delinquency in dues payments subjects the employee to discharge, in accordance with a procedure prescribed by that clause.[2]

Plaintiff was employed as a TWA flight attendant from July 1971 to January 1973 and from April 1974 to August 8, 1975. When she became a member of the Union

1. See letters of plaintiff's counsel dated June 11, 1976, March 24, 1977 and June 16, 1977. During the pendency of these motions Local 551 was succeeded as bargaining representative by the Independent Federation of Flight Attendants. By letter dated June 16, 1977, plaintiff's counsel has suggested that the preliminary relief requested may be ineffective in light of this change and has requested, in the event summary judgment is denied, procedurally restructuring the action. This opinion and order, however, renders his request moot.

2. Article 22 of the collective bargaining agreement is entitled "Association Security" and provides in pertinent part:

(A) Each employee now or hereafter employed in any classification covered by this Agreement shall, as a condition of continued employment in such work, within sixty (60) days following the beginning of such employment or the effective date of this Article, whichever is later, become a member of, and thereafter maintain membership in good standing (as herein defined), in the Union, except as provided otherwise herein. Such condition shall not apply with respect to any employee to whom such membership is not available upon the same terms and conditions as are generally applicable to any other member of his classification, or with respect to any employee to whom membership is denied or terminated for any reason other than the failure of the employee to tender the dues uniformly required of other members of his classification as a condition of acquiring or retaining membership.

The condition of payment shall be met if the amount due is tendered to the Treasurer of the Association in person or is mailed to him within the prescribed time limits. For the purpose of this Article, "membership in good standing in the Association" shall consist of the payment by the employee, not later than the last day of the second following calendar month, of dues for each calendar month and initiation fees (not including fines and penalties), which are uniformly required of members of his classification as a condition of acquiring or retaining membership. The employee may have his monthly membership dues deducted from his earnings as provided in paragraph (N) of this Article, or he may pay his membership dues directly to the Association.

. . . . .

(E) When an employee becomes delinquent by not meeting the requirements of (A) above for "membership in good standing in the Association," the following procedure shall be observed:

(1) The Treasurer of the Association shall notify the employee by registered letter, return receipt requested, copy to the Company's Director of Labor Relations—Flight, that the employee is delinquent in the payment of dues as specified herein and accordingly is subject to discharge as an employee of the Company. Such letter shall also notify the employee that she or he make the required payment within fifteen (15) calendar days of the date of mailing of the notice or be subject to discharge under the terms of the Agreement. If the notice above is not received by the employee or is delayed in reaching such employee as the result of the employee's failure to keep both the Company and the Association informed as to her or his correct current mailing address, no extension in the time limit specified in the original notice is required.

(2) Upon the expiration of the fifteen day period following the mailing of the notice in subsection (1) above, if the employee still remains delinquent the Treasurer of the Association may certify in writing to the Company's Director of Labor Relations—Flight that the employee has failed to make the required payment within the fifteen (15) day grace period and is, therefore, to be discharged.

(3) Within fifteen (15) days after receipt by the Company of the Association's certified notice in subsection (2) above that the employee is to be discharged, the Company shall discharge the employee from its services for his or her failure to pay or to tender dues as required under this Article.

in May 1972, she executed a dues checkoff authorization, allowing TWA to deduct her union initiation fees and monthly dues from her paychecks and remit the same to the Union on her account. This procedure continued until January 1973, when she took a position with TWA as a temporary instructor. In July 1973, she accepted a position as a TWA training supervisor and continued in that capacity through October of that year. A strike and subsequent layoff preceded her return to flight attendant status in April 1974. It is undisputed that this fifteen-month interval in flight attendant employment was not covered by the terms of the collective bargaining agreement, relieving plaintiff of any obligation for union dues.

Section Q of the union security clause provides for the automatic revocation of an executed checkoff authorization of an employee transferred to a job not covered by the collective bargaining agreement, and requires the execution and receipt of another checkoff form before dues deductions will be made from the paycheck of an employee who returns to a covered position.[3] However, when plaintiff returned to her job as a flight attendant in April 1974, she executed numerous payroll and personnel forms, but it was not until January 1975 that she signed and submitted a new checkoff authorization, having discovered a blank authorization form in her mailbox the previous month. Dues were thereafter checked off by TWA and remitted to the Union as of March 1975.

By registered letter dated April 10, 1975, defendant Trolf notified plaintiff that she was in dues arrears of $110.50 for April 1974 through April 1975, and that failure to tender full payment within fifteen days would subject her to discharge under the union security clause. This letter enclosed another dues checkoff authorization form. Similar notices were sent to forty-four other flight attendants; and the following day notice of these actions was sent to TWA. Plaintiff protested the amount demanded in a letter dated May 5, 1975, and advised Trolf that her union dues had been "deducted for several months now." She suggested that "[t]he way this matter has been handled is intolerable. I suggest that you check the accuracy of your records." The Union complied with this suggestion and on May 13, 1975, Trolf advised plaintiff that newly arrived TWA payroll records indicated deductions for March and April 1975, and that plaintiff's arrearage was reduced to $93.50 to reflect these payments. Trolf added that if plaintiff found the situation "intolerable," she should provide the Union with payroll stubs or other verification showing that additional dues had been paid.

Prior to this adjustment, however, TWA was notified by Trolf on May 6, 1975, that Brady and eighteen other flight attendants were still delinquent and that their discharges were requested in accordance with the union security clause. Acting on this, TWA advised plaintiff by certified letter dated May 8, 1975, that her employment would be terminated as of August 8, 1975.

On July 21, 1975, plaintiff sent Trolf a personal check for $5, stating in a cover note that it was "the first in a series of payments . . . to cover past due union dues." Trolf credited plaintiff's account but advised her by letter dated July 30, 1975, that "partial payments are not satisfactory" and that she would remain "subject to termination on August 8, 1975 if payments of our billing [now reduced to $88.50] is not paid in full."

**3.** Article 22(Q) provides:
(Q) An employee who has executed a checkoff form and who has been (1) transferred or promoted to a job not covered by the Agreement, (excluding transfers or promotions on a "Temporary" or "Acting" basis), (2) who has taken a leave of absence without pay, (3) who quits or resigns from the Company, (4) who is laid off, or is (5) otherwise terminated from the employ of the Company, shall be deemed to have automatically revoked her or his assignment as of the date of such action and if she or he (1) transfers back or returns to a job covered by the Agreement, (2) returns from leave of absence, (3) is rehired, (4) is recalled or (5) re-employed, further deductions of Association dues will be made only upon execution and receipt of another checkoff form.

On August 6, 1975, Trolf received messages from plaintiff, relayed through her supervisor. The first, dated August 1, asked for Union help and advice and left a telephone number where plaintiff could be reached; the second, dated August 5, advised that plaintiff had sent a $40 check for back dues and would pay the balance on August 17. No effort was made by the Union to contact plaintiff.

Notwithstanding the receipt by the Union of this partial payment on the morning of August 8, TWA was advised by the Union that day to discharge plaintiff. Three days later, plaintiff was so advised; the same day she tendered the full amount of her dues arrearage to Trolf but was told that her recourse at that point was to appeal her discharge to the TWA Flight Attendant System Board of Adjustment. A System Adjustment Board Grievance was prepared that day; a subsequently held Board hearing resulted in a denial of plaintiff's grievance.[4]

4. Plaintiff alleges that she appealed the decision of the System Board of Adjustment to the Committee on Appeals of the Transport Workers Union of America, AFL-CIO, Local 551's parent organization and that "defendants' parent body has made a mockery of its own constitutional appeal processes by wholly ignoring my appeal of October 13th, 1975." (Plaintiff's affidavit ¶ 7). This parent organization, however, has not been made a party to this action.

5. 29 U.S.C. § 411 provides in pertinent part:
   (a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.
   (2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings:

Plaintiff claims that the actions taken by defendants resulting in her discharge from TWA violate Sections 101 and 609 of the LMRDA, 29 U.S.C. §§ 411 and 529, guaranteeing equal rights and freedom of speech to all union members, as well as procedural safeguards against improper disciplinary action, and prohibiting a union from expelling a member for exercising the aforementioned rights.[5]

To support her claim of unfair treatment by the Union, plaintiff contends that she was deprived of good standing as a union member on checkoff status in violation of the notice provision of Article XIII, § 3 of the Constitution of the Transport Workers Union of America, AFL-CIO, (the Internal Constitution) to which the collective bargaining agreement is subordinate. Although Article XIII, § 3 allows for the automatic placement in bad standing of a dues-delinquent union member as of the fifteenth day of any particular month of nonpayment, it mandates a thirty-day registered mail notice of the correct amount of dues indebtedness before a member on

Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.
   (5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
   (b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.
29 U.S.C. § 529 provides in pertinent part:
   It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.
. . . .

checkoff status can be so placed.[6] Plaintiff also invokes the provisions of Article XIII, § 4, providing in part that "[any member in bad standing] shall not be restored to good standing until he has met all his financial obligations to the Union," in contesting defendants' rejection of her full tender of dues arrears on August 11, 1975.

To compound the purported illegitimacy of her expulsion, plaintiff accuses defendants of conspiring to deprive her of her membership rights as a result of her questioning the amount of her dues indebtedness in her letter to Trolf of May 5, 1975. To evidence this assertion, she offers a statement contained in defendants' submission to the Adjustment Board indicating that her $40 partial payment was received in the afternoon of August 8, 1975, after the Union had confirmed its discharge request to TWA, as well as a copy of her letter enclosing that partial payment marked with the Union's time stamp showing receipt at 10:00 a.m. that morning.

Defendants contest plaintiff's entitlement to thirty-day notice and dispute that her expulsion resulted from any thing more than her nonpayment of dues. They assert the legitimacy of the actions taken by virtue of the union security clause of the collective bargaining agreement, and the irrelevance of any time variation in the Union's receipt of plaintiff's partial payment of her dues arrears in the absence of a full tender prior to August 8, 1975. In addition, Teolis and Trolf contest the legal sufficiency of the complaint insofar as it alleges actions taken by them in their official capacities.

■ Before reaching the merits of these contentions, defendants' threshold challenge to judicial consideration of this action must be resolved. Defendants contend that under Section 3, First (m) of the Railway Labor Act, 45 U.S.C. § 153, First (m), awards of Systems Boards of Adjustments, created by § 204 of that Act, 45 U.S.C. § 184, and made applicable to air carriers by § 201, 45 U.S.C. § 181, are final and binding on the parties to the dispute, and that, in the absence of failure to comply with the Act, lack of Board jurisdiction or fraud or corruption of a Board member, *see* Section 3, First (p) and (q), 45 U.S.C. § 153(p) and (q), judicial review is precluded. Since none of those exceptions are presently urged, defendants contend that the decision of the Systems Board of Adjustment, denying plaintiff's claim, is final. In support of this contention, they cite such cases as *Gunther v. San Diego A. E. Ry.,* 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965); *Giordano v. Modern Air Transport IBT System Board of Adjustment,* 504 F.2d 882 (5th Cir. 1974); and *Rosen v. Eastern Airlines, Inc.,* 400 F.2d 462 (5th Cir. 1968), *cert. denied,* 394 U.S. 959, 89 S.Ct. 1307, 22 L.Ed.2d 560 (1969).

Defendants' reliance on these precedents is misplaced. In those cases enforcement or review of a Board determination was sought and the focus was on the employee's discharge by the employer; here, the issue involves the legitimacy of the actions of the bargaining agent, notwithstanding that these acts ultimately resulted in termination by the employer. It appears that the Railway Labor Act does not empower adjustment boards to hear this type of dispute. *See Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Verville v.*

---

**6.** Article XIII, § 3 of the Constitution of Transport Workers Union of America, AFL-CIO, provides in pertinent part: ·

SECTION 3. Membership dues are due and payable on the first working day in each calendar month. Any member who fails to pay his dues for a particular month on or before the fifteenth day of such month shall be in bad standing. Any member to whom dues checkoff is available and who signs and delivers to the Local Financial Secretary-Treasurer, or other authorized person, a check-off authorization shall be considered in good standing regardless of when in a particular month the employer deducts his dues for such month or when the employer pays his dues over to the Union. Where for any reason the dues of a member who pays his dues by check-off authorization are not checked off by the employer for any month or months, said member shall remain in good standing until thirty days after the mailing to him by registered mail of a notice informing him of his indebtedness. Failure to pay within said thirty day period shall cause said member to become in bad standing. . .

*Intl. Assoc. of Machinists and Aerospace Workers,* 520 F.2d 615, 618 (6th Cir. 1975); *Brady v. Trans World Airlines, Inc.,* 401 F.2d 87 (3rd Cir. 1968), *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680; 21 L.Ed.2d 691 (1969). Thus, the decision of the System Board of Adjustment does not preclude my consideration of the merits of this action.

Defendants contend that plaintiff's grievance involves nothing more than the exercise of the Union's right to effect the discharge of a member for nonpayment of dues. In this regard, the broad and unfettered power of a union to enforce the provisions of a union security clause against those members delinquent in dues payments has been upheld despite a belated tender of dues arrearage. *See Cunningham v. Erie Railroad Co.,* 266 F.2d 411, 416–17 (2d Cir. 1959); *N.L.R.B. v. Technicolor Motion Picture Corp.,* 248 F.2d 348 (9th Cir. 1957); *International Association of Machinists, AFL-CIO v. N.L.R.B.,* 247 F.2d 414 (2d Cir. 1957). Indeed, Section 101 of the LMRDA, 29 U.S.C. § 411, incorporated into Section 609, 29 U.S.C. § 529, excludes from its list of protected rights expulsion for failure to pay dues. *See Smith v. Local 25,* 500 F.2d 741, 750 (5th Cir. 1974). This exclusion is made express in Section 101(5), 29 U.S.C. § 411(5), specifically exempting action taken for nonpayment of dues from the requirement of a full and fair hearing before discipline can be imposed upon a union member.

However, it is apparent that a union may not effect a valid discharge on a proscribed basis under the guise of nonpayment of dues. By claiming that her discharge was prompted by her exercise of free speech in questioning the amount of her delinquency, and that it was effected arbitrarily and unfairly in violation of the provisions of the Internal Constitution, plaintiff thus attempts to fit herself under the protection afforded by the LMRDA to overcome congressional and judicial recognition of the union's right to effect discharge for dues delinquency. The record before me of this "documentary case," as plaintiff has characterized it, fails to support plaintiff's position.

Plaintiff claims that her letter of May 5, 1975 requesting that the Union recheck the amount of her dues delinquency "touched off a raw nerve of antipathy of defendants for plaintiff that would later lead them to falsify and doctor their records to conceal an entrapment." (Plaintiff's memorandum at p. 4). This "falsification," it is contended, consisted of defendants' statement to the Adjustment Board indicating receipt of plaintiff's $40 partial payment in the afternoon of August 8, 1975 in the face of a Union time stamp on plaintiff's cover letter indicating receipt in the morning. Defendants do not dispute these facts, but disclaim any improper motive in expelling plaintiff. An analysis of the undisputed record indicates the absence of improper motive and the failure of plaintiff's proof to create a genuine factual issue of motive which would preclude such a finding on this motion.

Plaintiff's letter of May 5, 1975, requesting that the Union recheck its records relating to the amount of her dues delinquency, can hardly be said to have triggered the type of animus that plaintiff claims to have motivated defendants. This is so particularly where, as here, the Union, in response to plaintiff's inquiry, promptly rechecked its records, reduced her indebtedness in accordance therewith, and invited her to submit verification of other dues payments made of which it had no record. Yet it was not until over two months after this adjustment was made, and after plaintiff was notified by TWA that her discharge would be effective August 8, 1975 if she did not arrange payment with the Union prior to that date, that plaintiff took action. This action consisted of her sending $5 to the Union and informing defendants, by letter dated July 21, 1975, that she would make a series of payments. Although this payment was credited to her account, plaintiff was immediately advised that partial payments were unacceptable and that in order to avoid termination on August 8, 1975, full payment would have to be made prior to that date.

Trolf has attested that she would have called plaintiff to arrange for the tender of the balance of plaintiff's dues arrearage by August 8, 1975 had the Union received the $40 partial payment prior to that date, but not having so received that payment, she proceeded on August 8, 1975, to certify plaintiff's continued delinquency to TWA and to request plaintiff's consequent discharge. It is defendants' position that so long as only partial payment was tendered on August 8, the time of that tender is irrelevant since full payment alone would suffice to cancel plaintiff's ensuing termination. In support of its position and to demonstrate the lack of improper motive in effecting plaintiff's termination, Trolf has also attested to the fact that she returned partial payments to flight attendants other than plaintiff who, like plaintiff had not tendered the full amount of their dues arrearages prior to their termination dates. Plaintiff does not dispute this fact.

Since plaintiff's objection to the amount of her dues indebtedness prompted an immediate adjustment and plaintiff was but one of many flight attendants notified of dues indebtedness who, despite notice to the contrary, failed to tender full payment thereof prior to their target discharge dates, the fact that defendants indicated the wrong time of receipt of plaintiff's partial payment is simply insufficient to create a genuine question of motive. Trolf's letter to plaintiff of August 11, 1975, returning the $40 partial payment indicates that the Union would accept full payment of plaintiff's dues arrearage if plaintiff succeeded before the System Board of Adjustment. Viewing the record as a whole, it simply cannot be said that "defendants were taking no chances that anything might go amiss and rob them of their opportunity to expel this big-mouthed member." (Plaintiff's memorandum, p. 6).

Plaintiff's claim or arbitrary treatment is two-pronged: that she was not given the proper notice required by Article XIII, § 3 of the Internal Constitution, and that her August 11, 1975 tender of the balance of her dues arrears was wrongfully rejected in violation of § 4 of that Article.

As indicated previously, § 3 mandates thirty-day notice to "any member to whom dues checkoff is available and who signs and delivers . . . a checkoff authorization." By operation of the terms of the union security clause of the collective bargaining agreement, dues · checkoff was made available to plaintiff as a flight attendant; however, plaintiff's original checkoff authorization was automatically revoked when she transferred to a position concededly without the scope of the agreement. It was not revived when she returned to flight attendant status in April 1974. Consequently, for the months of her dues delinquency, she was not a Union member on checkoff status,[7] and thus not in the class of Union members entitled by Article XIII, § 3 to thirty-days' notice.

Plaintiff's final claim under Article XIII, § 4, is likewise insubstantial. Section 4 merely sets forth the ineligibility of a member in bad standing to participate in Union affairs and the requirement that such a member "shall not be restored to good standing until he has met all his financial obligations to the Union." It certainly does not mandate this restoration on full tender of dues arrearage after termination has been effected.

---

**7.** Although plaintiff executed and returned the check-off form in January 1975, it was apparently not until March 1975 that TWA began to deduct the dues from her salary in accordance therewith. Thus, there was a two-month period for which "check-off was available" and for which an authorization had been "sign[ed] and deliver[ed]." However, plaintiff has ignored this discrepancy, opting instead to challenge the procedure as it related to the entire period of dues non-payment; therefore, for the purposes of this motion, this lag in the effective date of plaintiff's check-off status will be disregarded.

I do note, however, that Trolf has attested to notifying plaintiff of her dues delinquency for the period of April 1, 1974 to October 31, 1974, in November 1974, at the time when plaintiff received her second check-off form. Plaintiff disputes receipt of this notice and defendants have not relied on the delivery of the same to support their position.

Since plaintiff has failed to adduce proof which would create a triable issue under the LMRDA, it is unnecessary to reach the individual defendants' claims of legal insufficiency. Defendants' motion for summary judgment is granted. Plaintiff's cross-motion for partial summary judgment and/or a preliminary injunction is denied.

IT IS SO ORDERED.