## NATIONAL LABOR RELATIONS BOARD v. INTERNATIONAL ASS'N OF MA-CHINISTS, LOCAL NO. 504.

### No. 13400.

#### United States Court of Appeals Ninth Circuit.

#### March 16, 1953.

George J. Bott, General Counsel, NLRB, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Bernard Dunau and Thomas F. Maher, Attys., NLRB, Washington, D. C., David Karasick, San Francisco, Cal., for appellant.

Plato E. Papps, Washington, D. C., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

The National Labor Relations Board, after finding that the above named Union had been guilty of an unfair labor practice in violation of § 8(b) (2) and § 8(b) (1) (A) of the National Labor Relations Act, as amended,[1] issued its order that the Union cease and desist from causing or attempting to cause the employer, Westinghouse Electric Corp., to discharge or otherwise discriminate against its employees, and particularly, to make whole one Clyde Scheuermann for any loss of pay he may have suffered as a result of the discrimination. No question is raised as to the jurisdiction of the Board, and there is no dispute as to the Board's findings of fact insofar as they recite what the various parties mentioned in the findings said and did. The controversy relates to the inferences and conclusions which the Board has drawn from these basic admitted happenings.

The employer, here called the Company, was engaged in the manufacture of electrical and steam equipment at Sunnyvale, California. Scheuermann had been employed for about eight years by the Company or its predecessor in ownership of the plant. He was a member of the respondent Union. The Company and the Union had had a closed shop agreement which expired on April 1, 1949. Before that agreement expired Scheuermann organized another Union among the employees. He became its first president and managed an active campaign to oust the respondent Union as the employees' representative. The Union then charged Scheuermann with "dual unionism", in violation of its constitution, tried him, expelled him from the Union, and fined him $500. While the proceedings for his expulsion were going forward in the Union, but before he had been notified that that action had been approved by the Union's international headquarters, Scheuermann attempted to pay his dues to a shop steward who refused them saying: "I can't take dues from you. I have been told not to." Shortly thereafter, and still in the month of March, 1949, Scheuermann made this payment of dues to another shop steward. He made another payment of dues at the Union's office on May 2, 1949, but both these payments were returned to him on June 3, 1949, with a letter stating that as he had been officially expelled from membership and fined $500 he was "not a member of the International Association of Machinists and dues could not be accepted from him." Shortly after this, the Board ordered an election to determine whether the respondent Union or the union which Scheuermann helped to organize should be selected as bargaining representative for the employees. The respondent Union won the election and was again certified. It then began negotiations for a new agreement, and following an election which authorized the Union to negotiate a union shop agreement, the Union reached a final agreement with the Company which contained a union-security provision in the usual form and which complied with the restrictions of the Act.[2] The negotiated con-

1. "Sec. 8(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."

2. The Union security provision was as follows: "All employees in the bargaining unit described in Section I shall on and after the thirtieth day following the beginning of their employment, or October 10, 1949, whichever is the later, become and remain members of the Union, as a condition of their employment during the life of this agreement, and the Union shall notify the Company promptly in writing of the failure of any such employee to become or remain a member of the Union; provided, however, that the Union shall not request the company to discriminate against any employee for non-

tract was formally executed on October 10, 1949. The Board found that Scheuermann knew of this provision.

A few days after this contract had been signed, one Ollis, another employee, who also had been fined and expelled from the Union at the same time and under the same circumstances as Scheuermann, asked the Union steward to accept his union dues. Scheuermann was also present. This was the same steward who had previously refused Scheuermann's offer of payment of dues. He replied to Ollis, in the presence of Scheuermann, "You know I can't take dues from you guys."

On November 11, 1949, the day following expiration of the 30 day period specified by the union-security agreement, the Union presented to the Company a written request that Scheuermann be discharged for non-compliance with the union-security provision. The Union representative assured the Company's manager that Scheuermann had been given the same opportunity to join the Union as all other employees under the Union's jurisdiction.[3] When Scheuermann reported for work on that day he was notified of the Union's request and was forthwith discharged.

Three days later Scheuermann went to the Union office and sought reinstatement and asked what he could do about his being laid off. The Union's business agent stated, "Yes, Clyde, I think we can do something. You pay your back dues and your new initiation fee and the $500 fine." The Union's constitution required that a member pay a reinstatement fee and that his "reinstatement shall not be effected * * * until * * * the fines and assessments are either remitted or paid in full." The Board found that the Union had requested Scheuermann's discharge because he had failed to pay the fine imposed on him. It held that the Union's representation to the

Company that it was requesting his discharge because he failed to tender dues and initiation fee was not in accord with the facts, and that the fact that within the 30 day period Scheuermann did not actually tender his Union dues, or a new initiation fee, if one was required, was irrelevant and unimportant for the reason that the conduct of the Union, both before and after that period, as well as the refusal to accept an actual tender from another employee in Scheuermann's presence during that period, disclosed that any such tender by Scheuermann would have been a futile gesture and an idle act. The Board concluded that since under § 8(a) (3) and § 8(b) (2) of the Act the union-security agreement may be lawfully invoked to bring about a discharge only for an employee's failure to tender his periodic dues and initiation fees, and since this respondent Union had invoked the union-security agreement to bring about Scheuermann's discharge for another reason, namely, for his failure to pay a Union fine, the Union had violated the Act.

The Union vigorously argues that the inferences drawn by the Board and the conclusions arrived at by it cannot be sustained by this record, primarily for the reason that admittedly Scheuermann did not within the 30 day period actually tender his dues and initiation fees. It further argues that what would have happened if he had made that tender is purely speculative and not demonstrated by the preponderance of the evidence upon the whole record.

In the case of National Labor Relations Board v. Eclipse Lumber Co., 9 Cir., 199 F.2d 684, this court enforced against a union an order of the Board similar to that now before us, where the facts were substantially the same as those here. It involved a discharge at the instance of the union, pursuant to a similar union-security

membership in the Union if such membership is not available to the employee on the same terms and conditions generally applicable to other members or if membership is denied or terminated for reasons other than the failure of the employee to tender the periodic dues or initiation fees uniformly required by the

Union as a condition of acquiring or maintaining membership."

3. The Board dismissed the complaint against the Company on the ground that the latter had no reasonable ground for believing that the Union's request for Scheuermann's discharge was for reasons other than those permitted by the Act.

contract. As here, the union in that case had a constitutional provision requiring a member previously dropped from the union to pay fines and other exactions, which were above and apart from current dues and initiation fees, as a condition precedent of reinstatement. The employee had been told he had to pay these sums or he would not be reinstated. He did not within the 30 day period or at all offer the correct or proper sum.[4] This court there enforced the Board's order against the union for the latter's violation of § 8(b) (2) of the Act.

The union in Eclipse made substantially the same argument respecting the failure of the employee to make tender of the lesser appropriate amount and contended before us that without such tender the Board's finding of discrimination could not be sustained.[5] The Union's argument here is therefore foreclosed by what this court decided in the Eclipse Lumber Co. case.

Another more recent decision of this court sustains the principle which the Board here adopted in determining that "a formal tender is * * * unnecessary * * * where the circumstances indicated that such a tender would have been a futile gesture." In National Labor Relations Board v. Swinerton, 9 Cir., 1953, 202 F.2d 511, this court was dealing with the alleged refusal of an employer to employ workmen because of the employer's discriminatory practices. It was argued that no actual discrimination was proven because no jobs were actually available at the time the claimants visited the place where employment was sought. This court said: "While it is true that hiring took place at a later date, the job applicants were told that they could not obtain employment unless they received clearance from the Millwrights. Where such an illegal requirement has been imposed, and it is apparent from such discriminatory hiring policy that further application for employment would be futile, the job applicants need not go through the useless procedure of reapplying for employment at the later time when jobs are actually available in order to establish that they were victims of the discriminatory hiring policy." In so holding, this court relied upon two cited decisions from the fifth circuit.

The conclusion is unavoidable that if Scheuermann was denied membership in the Union, that denial was because of his failure to pay a fine. The question is, was Scheuermann denied membership and was the denial proven in view of the failure to make a tender? The rule that no man is compelled to do a useless act finds universal acceptance in cases dealing with the law of contracts generally. Just as an insurance company which informs the insured that it will not make payment for a known loss, is not in a position to defend for want of notice or proof of loss, (cf. Restatement, Contracts § 306), so the Union here is in no position to question the Board's proper conclusion that Scheuermann was in fact de-

4. In that case the Board held: "In addition, we find, as did the Trial Examiner, that Marl's failure to tender any dues does not preclude a finding of violation of Section 8(a) (3). We have previously held that an employee need not make a tender of uniform initiation fees or periodic dues to be entitled to protection under proviso (A), if membership in the contracting union is made available only upon compliance with a discriminatory term or condition. We have found above that membership in the Union was not made available to Marl upon a nondiscriminatory basis. We have also held that a formal tender is even unnecessary in cases involving proviso (B) where the circumstances indicate that such a tender would have been a futile gesture."

5. The union stated in its brief: "The evidence in the record consisting of the testimony of Nelson, Winn and Calkins that a tender by Marl of $12.75 would have been accepted, corroborated by the past history of the Union in never refusing a tender, renders completely baseless and unjustified the Board's conclusion that the Union would have neither permitted Marl to achieve membership in good standing nor refrained from requesting his discharge even if he had made the tender of $12.75. It is on this unwarranted conclusion that the Board's decision rests, and such decision must fall along with the conclusion. Marl's failure to achieve good standing was due solely to his failure and refusal to tender any sum whatever to the Union. The Union's request for his discharge was therefore fully justified and legal, and cannot form the basis for a charge of unfair labor practice."

nied membership because of his failure to pay the fine.

Even so, the Union argues, the Board was not warranted in concluding that if Scheuermann had tendered his dues and initiation fees, the Union would have re-quested his discharge. Apparently the contention is that if the tender had been made, the Union would have been afraid to demand the discharge because it would have known that it was walking into trouble. The short answer to this is that the Union did request his discharge and it did so at a time when it was and had been insisting upon the making of exactions which both the union-security contract and the Act made unlawful. Under these circumstances the Union was in no better position than if there had been no union-security contract at all.

The order of the Board is enforced.