NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

REVERE METAL ART CO., Inc., and Amalgamated Union Local 5, UAW, Independent, Respondents.

No. 242, Docket 25868.

United States Court of Appeals Second Circuit.

Argued March 3, 1960.

Decided May 6, 1960.

On Petition for Rehearing June 16, 1960.

Duane B. Beeson, Washington, D. C., (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Fred Landess, Washington, D. C., on the brief), for petitioner.

Jacob E. Hurwitz, New York City, for respondent Union.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The National Labor Relations Board petitions for enforcement of an order, 123 N.L.R.B. No. 16 (1959), finding that Revere Metal Art Co., Inc. and Amalgamated Union, Local 5, UAW, with which Revere had entered into a union security agreement, had engaged in unfair labor practices in violation of §§ 8(a) (1), (2) and (3) and 8(b) (1)

(A) and (2) of the Labor Management Relations Act, 29 U.S.C.A. § 158. The order required cessation of recognition of the union and of performance of the collective bargaining agreement unless and until the union had demonstrated its majority status through a Board-conducted election. It directed the company and the union, jointly and severally, to reimburse employees for any initiation fees, dues or other monies paid or checked off as a condition of employment pursuant to the agreement. And it also forbade the company and the union from "entering into, maintaining, renewing, or enforcing any agreement * * * which provides for obligations to the Union on the part of employees other than the payment of initiation fees and dues as a condition of employment, or which grants the Union exclusive recognition or which requires employees to join, or maintain their membership in the Union as a condition of employment, unless such agreement which grants exclusive recognition or requires membership has been authorized as provided in Section 8(a) (3) of the Act." [1]

The company does not oppose enforcement; the union does. We hold the Board was warranted in finding that the employer and the union had engaged in unfair labor practices. We sustain also the remedies imposed in the order, including the reimbursement of initiation fees and dues, save only the prohibition of any new union security agreement that provides obligations by employees to the union other than payment of dues and initiation fees as a condition of employment. As to this we think the order went beyond the powers granted the Board by Congress.

Revere has its principal office and place of business in New York City where it is engaged in the manufacture and interstate sale and distribution of pen parts. In the summer of 1956 the union began a campaign among Revere's employees, and organizational picketing

---

[1]. The quotation is from the cease and desist provision as to the union; the pro- vision with respect to the company was similar.

began. By August the campaign was adversely affecting production. Following the alleged discriminatory discharge of an employee in mid-August, the picket line declared the company unfair, and Revere was cut off from essential supplies and services.

At the end of August, on instructions from the president of the company, counsel for Revere arranged for a meeting to be held with the union on September 10 to negotiate a collective bargaining agreement. The discharged employee returned to work and the picketing ceased. At this time Revere had 58 employees in the unit bargained for with the union. It made no investigation to determine whether the union represented a majority. The president was satisfied with the union organizer's having "shuffled," "flashed" or "flipped" in his presence some 27 to 29 cards, the first few of which bore the names of persons recognized as employees, and with the statement of the plant foreman "that he was inclined to believe that the union probably had a majority." No check was made against payroll or other records. Indeed it is not even clear the company knew whether the cards were signed at all, save the first few. At the hearing only 18 cards signed prior to September 1 were produced.

Negotiations for a union contract continued during the fall. The union organizer came to the plant in order to get additional cards signed. The plant foreman persuaded the organizer to leave the cards with him. The president told the foreman to have the cards signed but not to turn them over to the union organizer. On October 24 the foreman obtained signatures to 24 cards, about a third of these being duplicates of cards already signed. He accomplished this by presenting the cards to employees who were sent down to him "a couple at a time to get their checks and sign the cards." The foreman admitted that one worker was told that "he had to join the union or he would be fired. As far as I knew, that is what the procedure was." An employee testified the foreman gave him a card and said "you have to sign and give it back to me."

An agreement wherein Revere recognized Local 5 as exclusive bargaining representative of the employees in the unit was executed on November 13. This contained a clause requiring all employees to become members of the union within 30 days after the date of the agreement or, in the case of new employees, after the date of their employment and thereafter to continue to remain members of the union in good standing as a condition of employment. The constitution and by-laws of the union have numerous requirements for remaining a member in good standing other than the payment of initiation fees and dues. Fines may be levied by the executive board on any member found guilty of violating the constitution, by-laws or union rules. A member is required to leave the job immediately when ordered out on strike and to aid and picket when so directed and is forbidden to seek redress in any court before first seeking it through union channels. Violation of any of these obligations is expressly subject to such penalty, by way of fine, suspension or expulsion, as the executive board may direct. Assessments and fines must be paid before regular dues can be accepted.

After charges by an employee, complaint and hearing, the Board's trial examiner concluded that the company had violated § 8(a) (1), (2) and (3) and that the union had violated § 8(b) (1) (A) and (2) of the Act. On exceptions taken by the union, the Board affirmed and entered the order previously described.

 The evidence clearly warranted the finding that a majority of the employees had not authorized the union to represent them, either when the company began negotiations with the union in September or when it signed the agreement granting exclusive recognition on November 13. At most 18 of the 58 employees had signed authorizations prior to September, and the additional signatures obtained by the plant foreman in October cannot be counted

since these resulted from action forbidden the employer by § 8(a) (1) and (2) and the union by § 8(b) (1) (A). We need not determine whether, as urged by the Board and disputed by the union, these sections condemn the mere fact of the grant of exclusive recognition to and the receipt of such recognition by a union which had not been authorized by a majority, although we see the force of the Board's argument and the Fifth Circuit regards the proposition as "well settled," Dixie Bedding Manufacturing Co. v. N. L. R. B., 5 Cir., 268 F.2d 901, 905. Cf. N. L. R. B. v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710; N. L. R. B. v. Local 294, International Brotherhood of Teamsters, etc., 2 Cir., 279 F.2d 83. Here the evidence that the employees were summoned to the plant foreman's office, were there presented with cards authorizing union check-off when being given their paychecks, and were told they had to sign, showed coercion in the most literal sense. The Board was likewise justified in finding that the execution of an agreement with a union security clause was an unfair labor practice by the employer under § 8(a) (3) and by the labor organization under § 8 (b) (2). Such an agreement is permitted, *inter alia,* only when the labor organization is "not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice" and when it "is the representative of the employees as provided in § 9 (a)," and § 9(a) requires that the representative be "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." The agreement here failed on both counts. N. L. R. B. v. John Engelhorn & Sons, 3 Cir., 1943, 134 F.2d 553.

Since the union had thus been unlawfully imposed as exclusive bargaining agent upon the employees and the union security clause was unlawful in its inception, it was proper for the Board to strike down the agreement and to require that the union desist from representing the employees and to prohibit any further union security agreement until the union had demonstrated its majority status in a Board-conducted election.

We likewise decline to interfere with the Board's direction that the employer and the union jointly and severally reimburse the employees for initiation fees, dues or other monies paid or checked off as a condition of the employment pursuant to the union security agreement.[2] This Court said in N. L. R. B. v. Adhesive Products Corp., 2 Cir., 1958, 258 F.2d 403, 409, "The validity of reimbursement orders necessarily depends upon the peculiar circumstances of each particular case." While we annulled similar reimbursement orders in Morrison-Knudsen Co. v. N. L. R. B., 2 Cir., 275 F.2d 914 and Building Material Teamsters Local 282 v. N. L. R. B., 2 Cir., 275 F.2d 909, 912, the circumstances there were quite different from the instant case. Neither of those cases related to a union imposed on employees in violation of §§ 8(a) (1) and (2) and 8(b) (1) (A). Both related to discrimination violating §§ 8(a) (3) and 8(b) (2), Morrison-Knudsen through the method of operation of an exclusive hiring hall, and Local 282 because of the absence of the required 30-day clause in a union security agreement. Both concerned unions admittedly representing the majority of the employees and long recognized as such. In the Local 282 case there was "not a syllable of evidence that * * * the omission of the 30-day clause in fact

2. In answer to a question from the Court as to how orders imposing a joint and several reimbursement liability upon employer and union are applied, the Board, calling our attention to decisions respecting back pay orders, wherein the regional offices have been directed to "take all reasonable measures to insure that the back pay liability is borne equally" by both respondents, Ebasco Services, Inc., 107 N.L.R.B. 617, 621 (1953), states that informal instructions have been given these offices to follow the same policy in cases involving joint and several company-union liability for the reimbursement of dues and fees illegally exacted from employees.

had any coercive effect" and indeed "no suggestion that anyone would have acted one whit differently if the 1956 agreement had contained the prescribed 30-day clause." In the Morrison-Knudsen case the order was directed solely against the employer, the discrimination related to a small number of employees out of a large group, and the opinion enumerates other special factors making reimbursement an arbitrary remedy there. 275 F.2d 918. Here on the contrary there was substantial evidence that a majority of the employees had been coerced into joining the union. Though the Board might have excluded the employees who had voluntarily signed union cards before September 1 from the reimbursement provision, it did not abuse its discretion in not doing so since these employees may well have remained in the union only because of the status it had unlawfully acquired. For the courts to require a determination of the attitude of each employee in every case would impose impossible administrative burdens. Compare F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 1941, 121 F.2d 658, 663. We have been admonished that although orders requiring reimbursement to employees for dues paid to unions unlawfully forced upon them "somewhat resemble compensation for private injury," we must not consider them solely in that light since "they vindicate public, not private rights." Virginia Electric & Power Co. v. N. L. R. B., 1943, 319 U.S. 533, 543, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568. The fact that the union imposed in the Virginia Electric case was company-dominated does not appear to us to be a valid distinction here, at least as regards the union, from which the illegal activity emanated, and we see no other. In an appropriate case we might think a different view ought to be taken with respect to an employer who has been forced into an unfair labor practice by economic pressure from a labor organization. Certainly it would seem more equitable for the Board to consider the relative responsibility of employer and labor organization in these cases and apportion any

reimbursement liability accordingly than to apply a mechanical "joint and several" formula in every case. However, we do not need to decide this here since the employer has not objected.

We come finally to the clause in the Board's order quoted above which forbids the employer and the union from "entering into, maintaining, renewing or enforcing any agreement * * * which provides for obligations to the Union on the part of employees other than the payment of initiation fees and dues as a condition of employment." We think the only reasonable construction of the order is that the Board meant to ban such a clause in a new agreement even though the agreement "has been authorized as provided in Section 8(a) (3) of the Act." The Board's brief confirms this since it asserts (p. 13) that "the union-security agreement in this case is unlawful in that it exceeds the permissible statutory limits of preferential treatment for union members." We are therefore required to decide the question, on which both the Board and this Court found it unnecessary to rule in Biscuit and Cracker Workers Local Union No. 405, 109 N.L.R.B. 985 (1954), enforcement granted, 2 Cir., 1955, 222 F.2d 573, 577, whether a union security agreement is *ipso facto* an unfair labor practice if the union's constitution creates obligations other than payment of initiation fees and dues, unless the agreement expressly negates any claim by the union of a right to seek discrimination by the employer against a member who fails to comply. We hold it is not.

N. L. R. B. v. Spector Freight System, Inc., 8 Cir., 1960, 273 F.2d 272, 275–276, petition for certiorari denied 80 S.Ct. 879, cites abundant authority for the proposition that "the internal rules of a labor organization, designed to control its members, such as imposition of fines for failure to attend meetings, special assessments, and other penalties, not being 'periodic dues', may not be enforced by the union by a threat of loss of employment." However, the order here does not simply forbid a un-

ion from enforcing such rules by threat of loss of employment against a member and an employer from complying with such a demand. In effect, it prohibits the employer from entering into a union security agreement with a union whose constitution imposes on members any obligation other than the payment of initiation fees and dues unless the agreement expressly negates any right of the union to request discrimination against an employee for any default other than non-payment of these items, as did the agreement in N. L. R. B. v. International Ass'n of Machinists, 9 Cir., 1953, 203 F.2d 173, 174–175. We have found no court decision that either upholds or negates the authority of the Board to do this. All the cases cited to us by the Board, as well as those in Judge Matthes' recent opinion in the Spector case, supra, arose from the discharge of an employee under a union security agreement, allegedly because of termination of union membership for a cause other than non-payment of dues and initiation fees, and the remedy was simply reinstatement and a prohibition against similar action in the future. Nor are the Board cases clear. In International Harvester Co., 95 N.L. R.B. 730 (1951), the Board held that a union security agreement requiring an employee to pay general assessments violated § 8(a) (3) and that a contract containing such a clause thus did not bar another union from seeking an election. Accord, John Deere Planter Works, 107 N.L.R.B. 1497 (1954). However, three years later, in the Biscuit and Cracker Workers case, supra, the Board declined to adopt the "discussion and rationale" of an examiner who held the mere existence of such a clause to be an unfair labor practice, and the Board's instant decision contains no discussion of the question.

The problem arises from the manner in which the Taft-Hartley amendment dealt with union security arrangements. Section 8(a) (3) of the National Labor Relations Act of 1935 made it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," subject to a proviso that an employer was not thereby precluded from making an agreement with a labor organization not established as the result of an unfair labor practice and selected as representative of the employees as provided in Section 9(a), which would "require as a condition of employment membership therein." The Labor Management Relations Act of 1947 qualified this broad exemption in three respects. The first was by inserting after the word "therein" the words "on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later." The second, not here material, was the provision now appearing in altered form in clause (ii) with respect to elections. The third was the insertion of the final proviso reading as follows:

"Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

The correlative provision in § 8(b) (2) makes it an unfair practice for a labor organization:

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees un-

iformly required as a condition of acquiring or retaining membership;"

This makes it plain that the mere execution of an agreement limiting employment to persons who are already union members and not containing the 30-day clause is an unfair labor practice, as we held in Red Star Exp. Lines v. N. L. R. B., 2 Cir., 1952, 196 F.2d 78, and N. L. R. B. v. Gottfried Baking Co., 2 Cir., 1954, 210 F.2d 772. However, § 8(a) (3) does not similarly condition the exemption of union security agreements from the sweep of the prohibitory language upon existence of an explicit provision negating a right of the union to seek the discharge of an employee after union membership has been terminated for reasons other than nonpayment of dues or initiation fees; it simply prohibits an employer from justifying any discrimination against an employee for nonmembership if he has reasonable grounds for believing this was the cause of the termination of membership. And if the mere making of such an agreement is not an unfair labor practice by the employer under § 8(a) (3), it would not be one for a labor organization under § 8(b) (2). Nevertheless, if the statute stood alone, we would be much inclined to depart from a literal reading in favor of a view that Congress intended to prohibit not only actual discrimination by a union and employer for breach of union obligations other than the payment of dues or initiation fees but also the creation of a setting in which employees would think discrimination by the employer would likely ensue from such a breach. See Radio Officers Union v. N. L. R. B., 1954, 347 U.S. 17, 40, 74 S.Ct. 323, 98 L. Ed. 455; Red Star Exp. Lines v. N. L. R. B., supra, 196 F.2d at page 81. However, we think the more literal reading is required in the light of the legislative history of the relevant sections of the Labor Management Relations Act of 1947 and of other legislation *in pari materia.*

In the Labor Management Relations bill as passed by the House on April 18, 1947, H.R. 3020, 80th Cong., 1st Sess., U.S.Code Congressional Service 1947, p. 135, the analogue of the provisions with which we are here concerned was § 8(d) (4). This said that, notwithstanding any other provision of § 8, it shall not constitute or be evidence of an unfair labor practice to make effective and carry out:

"* * * provisions of a collective-bargaining agreement between an employer and a labor organization that is certified under section 9 as the representative of the employees in any bargaining unit of the employer (if such provisions are not in conflict with the law of any State in which the agreement is to be carried out), whereby the employer obligates himself in either of the following respects:

'(A) Not to retain in his employ in such unit any employee who, being a member of such organization thirty days from the date such provisions become effective, or becoming a member thereafter, fails to maintain his membership therein;

'(B) Not to retain in his employ in such unit any employee who fails to become a member of such organization within not less than thirty days after his employment, or within not less than thirty days after the date such provisions become effective, whichever last occurs, or who, having become a member within such period fails to maintain his membership therein;'

except that no such provision may have the effect of denying employment or continued employment to any individual who on or before the time required tenders to the organization the initiation fees and dues regularly imposed as a condition of membership therein and to whom, in spite of such tender, membership therein was denied, or of denying employment or continued employment to an individual who has been suspended or expelled from the

organization on some ground other than nonpayment of regular dues."

The same language had been in the House bill as it had been reported on April 11. In contrast, the Senate bill, S. 1126, as reported on April 17, contained in § 8(a) (3) the proviso "That no employer shall justify any discrimination," etc., similar to that in the Act as adopted.

This difference in language was not accidental. The report of the Senate Committee, S.Rep.No.105, on April 17, said as to § 8(a) (3), p. 20:

"The committee did not desire to limit the labor organization with respect to either its selection of membership or expulsion therefrom. But the committee did wish to protect the employee in his job if unreasonably expelled or denied membership. The tests provided by the amendment are based upon facts readily ascertainable and do not require the employer to inquire into the internal affairs of the union."

Even more significantly, it made the following explanation of the then § 8(b) (2), p. 21:

"It is to be observed that unions are free to adopt whatever membership provisions they desire, but that they may not rely upon action taken pursuant to those provisions in effecting the discharge of, or other job discrimination against, an employee except in the two situations described. Thus, an employee, even though he loses his union membership for reasons other than those set forth, may not be deprived of his job because of a contract requiring membership as a condition of employment."

The Senate amended the House bill to accord with its own. The conference report adopted the Senate wording of § 8 (a) (3) with a change not here important; the language with respect to unfair practices by labor organizations was somewhat altered but the change was not,

and was not deemed to be, material, H. R.Rep.No.510, pp. 41, 44.

The significance of this history is heightened by the action taken four years later when Congress for the first time permitted union security arrangements under the Railway Labor Act, 45 U.S.C. A. § 152. Paragraph Eleventh of that Section, added by the Act of Jan. 10, 1951, ch. 1220, 64 Stat. 1238, provides that notwithstanding any other law, carriers and duly designated labor organizations shall be permitted:

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

Since then Congress has twice amended Section 8(a) (3) of the Labor Management Relations Act, Act of October 22, 1951, ch. 534, § 1(b), 65 Stat. 601; Act of September 14, 1959, § 201(e), 73 Stat. 525, 542. On neither occasion has it sought to conform § 8(a) (3) in this respect to the language of the Railway Labor Act; indeed, in the portion of the 1959 amendment, § 8(f), which validates certain prehire agreements in the building and construction industry, Congress did not employ the Railway Labor Act formulation as to dues and initiation fees but provided only "That nothing in this

subsection shall set aside the final proviso to subsection (a) (3) of this section."

██ The history thus makes it plain that Congress did not mean to require, in cases governed by the Labor Management Relations Act, that a union desiring to enter into a union security agreement must change its constitution and by-laws to eliminate any provisions imposing obligations other than payment of initiation fees and dues. And when we read the language of § 8(a) (3) in the light of the history, we find ourselves unable to construe it as meaning that a union may not retain such provisions in its constitution and by-laws unless in the agreement with the employer it expressly disclaims any intention to enforce them as a condition of employment. Rather, the safeguard to the employee is postponed until discriminatory action is taken. That is what the words say, and the history shows that is what they were meant to say—that an employee "may not be deprived of his job because of a contract requiring membership as a condition of employment." We need not here determine what action in addition to reinstatement the Board may require when such a violation has occurred. While this solution may seem wanting in symmetry, the situation is not dissimilar from the ruling in Local 1976, Brotherhood of Carpenters and Joiners v. N. L. R. B., 1958, 357 U.S. 93, 99–100, 78 S.Ct. 1011, 2 L.Ed.2d 1186, that the Taft-Hartley amendment did not ban the making of an agreement with a "hot cargo" clause but only certain types of action to make it effective. Cf. § 8(e) added to the Labor Management Relations Act by the Act of Sept. 14, 1959, 73 Stat. 525, 542. Here, as there, "It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply-held views on the role of organized labor in the free economic life of the nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests * * * "

Paragraph IA(1) of the order is therefore modified by excising the words "which provides for obligations to the Union on the part of employees other than the payment of initiation fees and dues, or" and paragraph IIA(1) by excising the words "which provides for obligations to the Union on the part of employees other than the payment of initiation fees or dues as a condition of employment, or." As so modified the order will be enforced.

On Petition for a Rehearing

PER CURIAM.

The National Labor Relations Board petitions for rehearing of so much of our decision of May 6, 1960 as set aside a portion of its order relating to the union security agreement. It alleges, *first*, that, under § 10(e) of the Act, 29 U.S. C.A. § 160(e), the point was not properly before us and, *second*, that our decision was wrong.

(1) Throughout the proceeding before the Board, the union resisted the General Counsel's contention that the union security agreement was unlawful because of its alleged incorporation by reference of the provisions of the union's constitution creating obligations other than the payment of initiation fees and dues, and it excepted to the remedy recommended by the Examiner, which included the clauses we have ordered stricken. Although the exceptions may have fallen "short of desirable specificity," they were sufficient to preserve all grounds of objection, and certainly objections as to the legal power of the Board, as those in May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 387, 66 S.Ct. 203, 90 L.Ed. 145, were held to be.

(2) On the merits the N. L. R. B. cites certain additional Board decisions. Keystone Coat, Apron & Towel Supply Co., 121 NLRB 880, 884–85 (1958), is simply cumulative of the Board holdings cited in our opinion, namely, that a provision in a union security agreement specifically requiring the payment of assessments as well as initiation fees and dues renders

the agreement illegal *per se*. On the other hand, in Spartan Aircraft Co., 98 NLRB 73, 75 (1952), where there was no reference to assessments in the agreement itself the Board upheld a discharge clause substantially identical with that here, construing it as meaning "that the obligation to discharge extends only to situations recognized as valid by the statute." Zangerle Peterson Co., 123 NLRB No. 129 (1959), reveals a difference of opinion within the Board as to the relative scope of these two principles. The only decision cited which we think requires comment is H. Muehlstein & Co., 118 NLRB 268, 276 (1957). This suggested that an agreement which affirmatively provided that employees should pay union assessments as well as dues violated § 8(a)(1), although since there was no evidence of enforcement of the assessment provision, there was no violation of § 8(a)(3). The rationale of this view is explained in Convair, 111 NLRB 1055, 1057 (1955), modified sub nom. N. L. R. B. v. International Ass'n of Machinists, 9 Cir., 1957, 241 F.2d 695, as being that an agreement threatening loss of employment to an employee who fails to pay union assessments will "interfere with, restrain or coerce employees in the exercise of the rights guaranteed" in § 7, specifically "the right to refrain from any or all such [union] activities." Insofar as Muehlstein and Convair deal with § 8(a)(3), they support our decision, and we are unable to see how the argument is advanced by the reference to §§ 8(a)(1) and 7. For § 7 qualifies the words quoted above by adding "except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment" as authorized in § 8(a)(3), which provides that nothing in the Act shall preclude an agreement conforming to its terms. We are thus brought back to the question whether § 8(a)(3) outlaws the making of an agreement that does not expressly negate a right to discharge for noncompliance with union constitution provisions other than the payment of initiation fees and dues or,

as we have held, merely prohibits action by the union or employer to carry it out. We have no doubt that when such action is taken, both § 8(a)(3) and § 8(a)(1) are violated, but, in our view, this happens then and not before.

We recognize the question to be debatable as our opinion plainly intimated. We have thought our construction to be required to give effect to the sharp difference in the treatment in § 8(a)(3) of the 30-day clause, on the one hand, and union requirements other than initiation fees and dues, on the other, particularly in the light of the legislative history and the different wording of the Railway Labor Act, 45 U.S.C.A. § 152, Paragraph Eleventh. Having carefully considered the Board's petition, we adhere to that view.