297 F.2d 272
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT, AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO, and Local 899, International Union, United Automobile Aircraft, Agricultural Implement Workers of America, AFL-CIO, Respondents.
 No. 5828.
 United States Court of Appeals First Circuit.
 Heard October 2, 1961.
 Decided December 27, 1961.
 
 Elliott Moore, Atty., N. L. R. B., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., were on brief, for petitioner.
 Harold B. Roitman, Boston, Mass., for respondent.
 Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.
 HARTIGAN, Circuit Judge.
 
 
 1
 The petitioner, the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 541, 29 U.S.C.A. § 151 et seq. (hereafter called the Act), seeks enforcement of its order issued against respondent Union on March 2, 1961. The Board's order requires the Union to cease requesting John I. Paulding, Inc., a manufacturer of electrical fixtures and related products, located in New Bedford, Massachusetts, (hereafter called the Company) to discharge or otherwise discriminate against employees in violation of the Act, and from in any other manner restraining or coercing the employees in the exercise of their rights under the Act, and to post appropriate notices. This order was predicated on the Board's finding that the Union had violated § 8(b) (1) (A) and (2) of the Act by attempting to induce the Company to discharge thirty-three employees because they had failed to pay dues to the Union.
 
 
 2
 The facts giving rise to this finding are as follows. In 1958, following a close election in which it received slightly more than a majority of the votes, the Union was certified by the Board as the collective bargaining representative of the Company's production and maintenance employees. On July 2, 1958, the Company and the Union executed a collective bargaining agreement which provided, among other things, for a limited form of union security. Under the agreement, non-members of the Union employed by the Company were not required to join the Union. However, members and employees who thereafter joined the Union were obligated to maintain their membership for the duration of the agreement; new employees were required to join the Union after thirty days' employment.
 
 
 3
 The collective bargaining agreement of July 2, 1958 expired June 30, 1959. In May of 1959, before its expiration, a group of employees who had not joined the Union formed an anti-union committee to procure signatures for a petition for decertification of the Union as collective bargaining representative. The committee employed counsel who assisted them in drafting anti-union circulars and a decertification petition. These circulars, which the committee distributed to all employees in June 1959, advised the employees that they could resign from the Union when the collective bargaining contract terminated on June 30. Between June 12 and 27, the committee received seventeen resignations from the Union which were turned over to the committee's counsel. On June 29, the counsel had a deputy sheriff deliver a copy of each of these resignations to the Union and to the Company.
 
 
 4
 Upon the expiration of the contract on June 30, 1959, the Union commenced a strike which lasted some six months and was not settled until the following January. During the entire period of the strike the Company continued operations with non-union employees and new employees. During this period the anti-union committee also remained active seeking union members to drop their membership and return to work. A committee circular advised employees that if they returned to work during the strike without resigning from the Union they would be liable to Union charges. While the strike was thus in progress, nineteen employees signed resignations which were turned over to the committee; the latter, in turn, mailed one copy to the Union and one to the Company.[1]
 
 
 5
 The committee failed in its objective to have the Union decertified, and on January 11, 1960 the Union and the Company signed a new agreement which terminated the strike. Under the terms of this new agreement, all employees hired after June 30, 1959, the expiration date of the former agreement, were required to become members of the Union. As to other employees the agreement provided, in consonance with the previous agreement: "All present employees of the Company who on the date of the Agreement are members of the Union, * * * shall remain members of the Union for the term of this Agreement as a condition of continued employment with the Company."
 
 
 6
 All but one of the thirty-four employees who had resigned from the Union were employed by the Company when the new agreement was signed on January 11, 1960. On February 23, the Union wrote each of these workers, notifying them that they were delinquent in the payment of their dues and giving them seven days to correct this situation. The Union demanded that the workers pay dues not only for the two months that the new contract had been in effect, but also for the months that each employee had worked during the period of the strike and subsequent to the expiration of the initial agreement. The Union based its action on the assertion that the resignations of these thirty-three employees were invalid because they did not comply with the Union's constitutional provisions as to the time and form of resignation. Under the Union's constitution a resignation would be effective, inter alia, only if it was sent by registered mail to the financial secretary of the local union to which the member belonged "within the ten (10) day period prior to the end of the fiscal year of the Local Union." Here the end of the fiscal year of the relevant local year corresponded with the end of the calendar year. Each of the attempted "resignations" at issue here, having been tendered well in advance of the stipulated time period, failed to comport with the above-cited constitutional provision and, according to the Union, were invalid. Thus, under the Union's theory, as the resignations were invalid they were correspondingly ineffective to sever the members' relations with the Union and these individuals remained members, subject to dues, at all pertinent times.
 
 
 7
 On February 23, 1960, the Union advised the Company that each of the thirty-three employees was delinquent in payment of dues plus a reinstatement fee and that upon their failure to correct this default, the Union would request their discharge incident to the provisions of the contract. On March 9, 1960, the counsel for the anti-union committee, acting on behalf of the subject employees, filed § 8 (b) (1) (A) and (2) charges against the Union. On March 14, 1960 the Union filed a grievance against the Company charging it with violating the terms of the contract by not requiring the employees to pay the dues which they assertedly owed. The Union requested the Company to comply with the terms of the agreement by obliging the employees to tender the delinquent dues and the reinstatement fee which the Union claimed or to discharge them if they refused to do so. On March 22, the Company notified the Union that it would abide by the Board's determination of the status of the employees.
 
 
 8
 The Board found that the thirty-three employees were not subject to the union-security provision in the 1960 contract affecting employees who "on the date of [the] Agreement [were] members of the Union," because they had resigned from the Union prior to the execution of the agreement. The Board also found that even if the employees were still "members" because of an infirmity in their attempted resignations, the Union had improperly sought to have them discharged for failing to pay those dues which had accrued between June 30, 1959 and January 11, 1960 — that period when there was no union-security agreement in effect. Consequently, as the Union was therefore attempting to cause the Company to discharge employees for the nonpayment of dues which were not required by a union-security agreement, the Board found that the Union had violated § 8(b) (1) (A) and (2) of the Act.
 
 
 9
 We believe that the Board's order should be enforced. As noted above the Union sought the Company to discharge the instant employees for nonpayment of dues during two legally distinct intervals. Thus it not only sought discharge for the nonpayment during the term of the second contract but it also predicated its demand on the lack of payment during those months subsequent to the expiration of the initial agreement and prior to the execution of the new agreement — a period when there was no contract in effect between the Company and the Union. It is undisputed that under the plain terms of § 8(b) (2) and (1) (A) of the Act it is illegal for a Union to make such a demand unless a contract between the Union and the Company requires the payment of dues as a condition of employment. Here in the period from June 30, 1959 to January 11, 1960, no contract existed between the Company and the Union. While it may well be true that dues accruing during the interval when there is no collective bargaining agreement extant may give rise to continuing obligations vis a vis the employee and the Union, it is well established that dues falling due during such an interval may not be demanded as a condition of employment. National Labor Relations Board v. Eclipse Lumber Co., 199 F.2d 684, 685, 36 A.L.R.2d 625 (9 Cir. 1952); National Labor Relations Bd. v. International Union, Inc., 194 F.2d 698, 701-702 (7 Cir. 1952); Colonie Fibre Co. v. National Labor Relations Board, 163 F.2d 65, 67, 68, 70 (2 Cir. 1947); see, N. L. R. B. v. Spector Freight System, Inc., 273 F.2d 272, 275, 277 (8 Cir. 1960), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877; National Labor Relations Board v. Murphy's Motor Freight, Inc., 231 F.2d 654, 655 (3 Cir. 1956). Under this line of cases it has been uniformly held that the Union's demand for an employee's discharge on the ground of failure to pay dues during a period when no security agreement was in existence violated the Act. If an employee is a member of the Union during the period when no security agreement is in effect the Union may have a valid claim on the employee. However, nothing in the Act gives the Union the right to seek to enforce this obligation by threat of discharge. To permit a Union to seek discharge for dues accruing during a pre-contract period would be giving a retroactive effect to the maintenance of membership proviso which Congress clearly indicated was to apply solely during the "term" of an existing agreement. See National Labor Relations Bd. v. International Union, supra, 194 F.2d at 701-702; Colonie Fibre Co. v. National Labor Relations Board, supra, 163 F.2d at 67, 68. Under like reasoning, assuming, arguendo, that the present employees were still members of the Union at the time that the second contract was executed, the fact that they might have been forthwith liable for current dues does not exculpate the Union from having demanded, on penalty of discharge, an amount embracing the pre-contract dues. Cf. National Labor Relations Bd. v. International Ass'n of Machinists, etc., 203 F.2d 173 (9 Cir. 1953), and cases cited therein; see also, National Labor Relations Board v. Murphy's Motor Freight, Inc., supra, 231 F.2d at 655; Taylor v. Mutual Ben. Health & Accident Ass'n, 133 F.2d 279, 282, 283 (8 Cir. 1943); Shaner v. West Coast Life Ins. Co., 73 F.2d 681, 684, 685 (10 Cir. 1934).
 
 
 10
 For the foregoing reasons we believe that the Union's demand for discharge on account of nonpayment of dues during a period when there was no obligation on the employees to maintain membership in the Union as a condition of employment was violative of § 8(b) (2) and (1) (A) and, of itself, justified the Board's order in this case.
 
 
 11
 The question remains whether the Union was within its rights in demanding the discharge of these employees because of failure to pay current dues — dues accruing from the execution of the second contract. This issue turns on whether the employees had effectively withdrawn from membership in the Union prior to the execution of the agreement of January 11, 1960. It is again obvious that if they were not members of the Union when this contract was signed, they would not be subject to the maintenance of membership clause contained therein and would be under no obligation to continue the payment of Union dues as a condition of employment. As noted previously the Board found that the thirty-three employees were not subject to the Union-security provision of the January 11 contract embracing employees who "on the date of [the] Agreement [were] members of the Union," because they had effectively severed their relationship with the Union prior to the execution of the contract. The Union answers that since the resignations failed to comply with its Constitution and internal regulations they were invalid and, by hypothesis, incapable of effectuating a valid resignation by the employee. Consequently, having failed to meaningfully withdraw, the employees remained members of the Union — subject to dues and other obligations — at the time of the signing of the second agreement.
 
 
 12
 When these members forwarded their resignations the Union made no response. In particular it did not notify the would-be resigners that their resignations were in any respect defective. All but two of these employees purported to resign prior to October, 1959. The other two did so in October. During October the International Union adopted a provision in its constitution which provided that in order to resign a member must not be in arrears with respect to dues (none of these was) and as noted previously that resignations could be tendered only in the last ten days of the local's fiscal year, which in this instance corresponded with the calendar year. It does not appear whether this provision was new, or was merely reenacted. Nor does it appear whether, if new, the October date on which it was adopted preceded the October dates on which the last two employees resigned. The Union contends, nevertheless, that the resignations of all 33 employees were ineffective. The Board, in its brief, disagrees and asks us to decide that the resignations were effective not because of the chronological doubts we have just indicated, but for a more fundamental reason. It contends that Sec. 7 of the Act allows an employee freedom to refrain from membership when there is no collective bargaining agreement in force to the contrary.[2] The Union relies upon Sec. 8(b) (1).[3]
 
 
 13
 It may be that these two sections produce a conflict and that there is a limit of reasonableness beyond which a union may not be permitted to go in holding captive its members.[4] We do not wish, however, to pass upon this question where the Board, apart from its brief, has not seen fit to do so. If the Union renews its demand, a new hearing may lead to a simpler solution of the question. It may be, for instance, that when these resignations were tendered the defect now asserted did not exist. A constitutional amendment cannot, of course, retroactively invalidate a resignation. Or it may be that the January 11, 1960, agreement, in the light of the negotiations preceding it, is properly to be construed as excluding from the membership maintenance provision the strikers who sought to resign. It can hardly be thought that the Company intended the agreement to force these employees back into the Union. The evidence may disclose some proper basis for estoppel, or for setting aside or reforming the agreement on the ground of mistake.[5] For these reasons we decline to pass on this question at the present time.
 
 
 14
 A decree will be entered enforcing the order of the Board.
 
 
 
 Notes:
 
 
 [1]
 Included in this number were two employees who had previously "resigned" from the Union but later signed cancellations of their decertification signatures and joined in the strike
 
 
 [2]
 "Employees shall have the right to * * refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment * * *."
 
 
 [3]
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: [section 7 of the Act] Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * *."
 
 
 [4]
 One may ask, for instance, about a member who needs to shift unions in order to take another job
 
 
 [5]
 Consider the problem raised in 5 Williston, Contracts § 1557 (rev. ed. 1937); 3 Corbin, Contracts § 610, 614 (1960); Restatement, Contracts § 505 (1932). See also Parker v. Title & Trust Co., (9 Cir. 1956), 233 F.2d 505; Hawkins v. Fradkin, (1949), 85 U.S.App.D.C. 310, 178 F.2d 705; Flax v. Prudential Life Ins. Co. of America (D.C.S.D.Cal.1957), 148 F.Supp. 720