Samuel CUNNINGHAM, Plaintiff,

v.

ERIE RAILROAD COMPANY and the United Railroad Workers of America, Inc., C.I.O., Local 1463, Defendants.

United States District Court
S. D. New York.
July 1, 1965.

Jerome T. Orans, New York City, for plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, J. Roger Carroll, New York City, of counsel, for defendant Erie R. Co.

O'Donnell & Schwartz, New York City, by John F. O'Donnell, Walter N. Kaufman, New York City, of counsel, for defendant United Railroad Workers of America, Inc., C.I.O., Local 1463.

BONSAL, District Judge.

On October 10, 1955 plaintiff filed in this court his homemade complaint, naming as defendants Erie Railroad Company (Railroad) and The United Railroad Workers of America, Inc., C.I.O., Local 1463 (Union). The action was tried before Judge Murphy without a jury, and on May 23, 1956 he handed down his opinion and order dismissing the complaint for lack of jurisdiction. Plaintiff appealed, and the issue of jurisdiction was argued in the Court of Appeals on October 17 and 18, 1957; it was reargued on February 3, 1959, and by decision dated May 4, 1959 the Court of Appeals reversed the District Court, holding that the District Court had jurisdiction, and remanded the action for a new trial on the merits.

For reasons not clear to the court, the case was not retried until February 9, 1965, or almost six years after it was remanded.

Plaintiff's action arises under the Railway Labor Act (45 U.S.C. § 151 et seq.).[1] Plaintiff contends that the defendant Union violated its duties under the Act by discriminatorily expelling him from the Union and by causing his discharge by the defendant Railroad under the Union Shop Agreement then in force between the Union and the Railroad.[2]

1. The relevant provisions of the Railway Labor Act (45 U.S.C. § 152) are:

"[I]t shall be unlawful for any carrier to * * * influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions. * * *

* * * * *

"Eleventh. Notwithstanding any other provisions of this chapter, * * * any carrier * * * and a labor organization * * * shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided*, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

2. The Union Shop Agreement closely parallels the provisions of § 152, Eleventh (a) of the Railway Labor Act. Section I of the Agreement makes as a condition of employment membership in Local 1463, while Section III makes such a require-

Plaintiff contends that the Railroad violated its duties under the Act by failing to afford him with a remedy to protest the alleged discriminatory action of the Union.

Both the Union and the Railroad deny that they violated the Act. The Union contends that it expelled the plaintiff because of his failure to pay the dues uniformly required of all members under the Union's by-laws.[3] The Railroad contends that it offered the plaintiff a hearing on the matter of his discharge but he refused to avail himself of it.

From the records of this trial and of the trial before Judge Murphy, the following facts appear:

Plaintiff was employed by the Railroad as a porter on the Railroad's Hudson River ferry boats from 1943 until 1954. On December 21, 1954 the Union sent a written notice to the Railroad stating that plaintiff had failed to pay the dues required by the Union and requesting the Railroad to send the plaintiff notice of this fact. Under the Union Shop Agreement the Railroad was obligated to send an employee notice that he had

been cited by the Union for non-payment of dues, and to notify the employee that if he did not request a hearing from the Railroad within ten days of such notice, he would be discharged.

Upon receipt of this notice by the Railroad, Mr. Roderick, the Superintendent of its Marine Department, called plaintiff to his office and warned him that if the Union did not rescind its notice within 24 hours, the Railroad would have to send him a notice that if he did not appear for a hearing within ten days he would be discharged.

Thereafter, on December 24, 1954, the Railroad sent plaintiff the notice required by the Union Shop Agreement, to the effect that it had been notified by the Union that plaintiff had failed to pay his dues and that such nonpayment subjected him to dismissal. The notice advised plaintiff that he could request a hearing within ten days on the issue of payment of dues, and that if he did not request a hearing it would be assumed that the information furnished by the Union was correct, and his employment would be terminated. Plaintiff did not

ment inapplicable to employees if membership in Local 1463 is not available to them on the same terms and conditions generally applicable to any other member, or if their membership is denied or terminated for any reason other than the employee's failure to tender the dues uniformly required as a condition of membership in Local 1463.

Section IV of the Agreement, which provides the mechanisms by which the Agreement is enforced, provides that the Railroad shall assume an employee's compliance with the Agreement unless the Union notifies it to the contrary. Upon receipt of such a notice the Railroad is required to notify the employee he has been cited by the Union for non-compliance with the Agreement, and is required to accord the employee a hearing if the employee requests it. If an employee does not request a hearing, the Railroad is required to terminate his employment within thirty days of receipt of the Union's citation, unless the Railroad and the Union agree otherwise in writing.

Section VII of the Agreement provides that in the event that any employee is

discharged pursuant to the Agreement, and such discharge is subsequently deemed unlawful, the Union shall indemnify the Railroad from any and all liability arising from such an unlawful discharge.

3. Section 6 of Article II of the Union's by-laws provides as follows:

"The dues of the Union shall be Two (2) Dollars per member per month payable on the first day of each month. Members failing to pay dues on the first day of each month shall be delinquent in dues. Any member failing to pay his dues on or before the 30th day of the month for which the dues are payable, or who fails to pay assessments on or before the 30th day of the month in which assessments are due shall be automatically suspended from memberships in the Union.

"(A) Individual members of the Union who have not worked five (5) days in any calendar month through no fault of their own shall be exonerated from the payment of dues for that month."

request such a hearing, and on January 4, 1955 Roderick advised him orally that he would "be out of service" the following day. According to Roderick's testimony, "being out of service" is not the same as being discharged. An employee can be discharged only with the approval of the General Manager and Vice President of the Railroad.

On February 16, 1955 plaintiff received a formal notice from the Railroad that his services had been terminated by reason of noncompliance with the Union Shop Agreement, the termination effective January 6, 1955, and the notice added, "Services otherwise rendered satisfactory."

Prior to receipt by the plaintiff of the Railroad's termination notice, plaintiff, on January 11, 1955, mailed to the Union a check in the amount of $23 for his dues, which the Union returned on January 13, stating to him that, "Since you are no longer an employee of the Erie Railroad Company and have been dismissed from service under the terms of the Union Shop Agreement, we are returning your check for dues and reinstatement fees."

On January 26, 1955 (again prior to receipt of the Railroad's notice of termination) plaintiff wrote to the Union, enclosing a check for $10 to cover dues, and asking for notification of any additional assessments. The Union refused to accept the letter, which was returned to the plaintiff unopened.

Plaintiff did not pay his dues to the Union for the months of October, November and December, 1954.[4] Plaintiff's dues were at the rate of $2 a month, and his last payment prior to receipt by him of the notice of termination was on October 12, 1954, when he paid the Union $10 to cover his dues for May, June, July, August and September, 1954.

It appears from the testimony that during November and December 1954 plaintiff became concerned about his seniority rights. These seniority rights had antedated the Union Agreement, but apparently were recognized by both the Union and the Railroad as applicable to employees covered by the Union Shop Agreement. There were two job classifications for porters on the Railroad's ferry boats: (1) assigned jobs, and (2) extra jobs. Porters who had assigned jobs were permanently stationed on one of the ferry boats and, when a vacancy occurred on an assigned job, the job was put up for "bid" and went to the bidder who had the greatest seniority. Porters with extra jobs were placed, as need for their services arose, on any of the ferry boats, placement being made on the basis of the porters' seniority. A porter with an extra job could exercise his seniority to obtain an assigned job only when a vacancy in an assigned job occurred, but an assigned porter who became ill and returned to health or who was displaced, could displace any assigned porter who had filled his vacancy and was junior to him as an assigned porter, or, if he chose, the returning assigned porter could go on the extra job list.

In February 1954, plaintiff had the greatest seniority as an extra porter. At that time an assigned porter named Headley left his position because of his illness. The job went up for "bid", and the only bidder was another assigned job porter, Shell. When Shell took over Headley's job, his assigned job, in turn, came up for "bid" and was bid for by an extra job porter, Smith, who was junior in seniority to the plaintiff on the extra list. Plaintiff, preferring to remain as an extra porter with the greatest seniority, did not bid for either of these jobs. In November 1954 Headley returned to work and was entitled to get

---

4. Plaintiff contends that since he was out of work for five days in November, he did not owe dues for that month. However, this contention must be disregarded since the fair interpretation of the Union's by-laws (Article II, Section 6) is that payment of dues is excused only in months where the employee did not have five days of work during the month.

his job back since it was held by a man with less seniority; so Headley "bumped" Shell, who then had the option of displacing any junior assigned job porter or of going on the extra job list. Shell chose to go on the extra job list, and, by reason of the fact that he had more seniority than plaintiff, he superseded plaintiff as the senior extra job porter and plaintiff became the second man on the extra job list. Since there were a limited number of assignments available for extra job porters, plaintiff lost some two weeks' of work, all the extra job assignments going to Shell. This probably caused resentment on plaintiff's part, and it was aggravated by the fact that Smith, who was junior to him, now had an assigned job and plaintiff was unable to displace him. This situation continued from November 1 to November 17, when Headley again became ill. Shell successfully "bid" for Headley's job and plaintiff again became the senior extra porter.

■ The Court of Appeals decision handed down in 1959 (266 F.2d 411) continues to be the law of this case, regardless of the evolution which has taken place in the law since that time. So far as this case is concerned, the Court of Appeals has held that this court has jurisdiction to determine the plaintiff's claim on the merits. The issues, as delineated by the Court of Appeals, are whether the plaintiff was arbitrarily discharged in violation of the Railway Labor Act and the Union Agreement. The Court of Appeals specified that in order to establish a breach by the Union of its agreement to represent the employees fairly, it was not enough to establish that the Union was wrong in demanding that the Railroad dismiss the plaintiff; the Union's duty was no more than to forbear from "hostile discrimination". As to the "uniform requirement for dues", the Court of Appeals stated that the natural inference is that the Union is empowered to enforce its dues requirements with common sense, making allowances and concessions where need be.

The Union contends that this is what it did in connection with the plaintiff's dues. At the trial, the Executive Secretary of the Union (Hengartner) and the Shop Steward (McGrane) testified that it was the policy of the Union not to proceed against a member for nonpayment of dues until he had been delinquent for three months, and a member was not considered to be in arrears unless he failed to pay his dues by the end of the month for which they were due. This policy does not appear to have been applied with respect to the plaintiff since, if it had been, on December 21, 1954 when the Union sent the Railroad notice that plaintiff had failed to pay his dues, he would only have been two months in arrears. Moreover, the testimony raised a question as to whether the three months ruling was generally enforced. There was evidence that the Union accepted payments of dues from various members during 1953 and 1954 who were in arrears for more than three months, and, indeed, there were cases where the arrears were for more than six months. While undoubtedly some of these were the subjects of citations to the Railroad, it appears that plaintiff was the only member who was expelled from the Union for nonpayment of dues during this two-year period. Moreover, it was brought out in the evidence that the Union's method of collecting dues was most informal, consisting of requests at irregular intervals by shop stewards stationed on the ferry boats, and that for six weeks during the three months period in which it is claimed plaintiff did not pay his dues, there was no shop steward stationed on the ferry boat where plaintiff was working, and that no attempt was made during this period to collect dues from the plaintiff. It is true, as the Union points out, that plaintiff had been previously cited for nonpayment of dues on three occasions within the previous 13 months, but during this period another member, McEntee, was cited three times in ten months and then given a last chance to pay his dues before being expelled.

And finally, the Union contends that the plaintiff, unlike other members, flatly refused to pay further dues. However, the evidence indicates that his refusal was not final but was based on his preoccupation over his seniority. Plaintiff's schooling ended in the fourth grade, and he is obviously a man of limited education. He was confused between the obligation to pay dues and the matter of his seniority rights, and while his seniority rights do not appear to have been violated, it is understandable that plaintiff thought they were and that he thought he had a legitimate grievance which he wished to have ironed out before he paid his dues. It is likely that plaintiff's complaints about his seniority rights annoyed officials of the Union, but this does not provide an adequate basis for treating the plaintiff differently from other members as to payment of dues.

The Court of Appeals stipulated that the Union's duty was no more than to forbear from "hostile discrimination". The unusual treament accorded the plaintiff in connection with his dues, the inference that the Union was annoyed by reason of plaintiff's seniority claims, and the cavalier treatment accorded by the Union to the plaintiff when he sought to pay his dues on two occasions in January 1955 (prior to receipt by him of the Railroad's notice of termination) satisfy the court that the Union did not forbear from "hostile discrimination".

■ Accordingly, the court holds, on the evidence, that the plaintiff's discharge was for reasons "other than the failure of the employee to tender the periodic dues * * * uniformly required as a condition of acquiring or retaining membership."

■ It follows that plaintiff's discharge violated the Railway Labor Act and the Union Shop Agreement, and he is therefore entitled to judgment against the Union and the Railroad. The Railroad was required to serve the notice of termination on the plaintiff because it had been requested to do so by the Union. Moreover, Mr. Roderick informed the plaintiff as to his right to a hearing, but

it is quite understandable that the plaintiff thought the only matter which would be considered at the hearing was whether or not he had paid his dues, and since he had not, he concluded there was no purpose to be served in attending a hearing. Section VII of the Union Shop Agreement provided that in the event any employee is discharged pursuant to the Agreement and such discharge is subsequently deemed unlawful, the Union shall indemnify the Railroad from any and all liability arising from such an unlawful discharge. Since the court holds that the discharge was unlawful, the Railroad is entitled to indemnity from the Union as to any damages it may be required to pay hereunder.

■ As to damages, it was conceded at the trial that if the plaintiff had not been discharged by the Railroad he would continue to have been employed from January 5, 1955 through March 25, 1957, at which time his job would have been eliminated by reason of the consolidation of the Railroad's and the Lackawanna Railroad's tug services. Moreover, had he been employed by the Railroad on March 25, 1957, he would have been entitled to one year's severance pay by reason of his job elimination.

Plaintiff earned $3,466 in 1953, and $3,385 in 1954, or an average of $3,425. Applying this average, his wages for the period from January 5, 1955 through March 25, 1957 would have been $7,706. Adding a year's severance pay at the same average rate of $3,425 makes a total of $11,131. During part of the period between January 5, 1955 and March 25, 1957 plaintiff was employed in Max Schling's Flower Shop and received total wages of $1,548. Deducting $1,548 from $11,131 leaves a balance of $9,583, which the court finds to be the damages suffered by the plaintiff by reason of his wrongful discharge.

Plaintiff is entitled to interest on the award for damages, and the parties are invited to submit memoranda upon settlement of the judgment to be entered herein, as to the date from which interest should accrue. In this connection,

the parties should advise the court as to why there was such a long delay between the Court of Appeals' decision in 1959 and the second trial in 1965.

Judgment, to be settled on notice, will be entered in favor of the plaintiff and against both defendants in the amount of $9,583 with interest at the rate of 6% per annum from the date to be inserted by the court in the judgment.

The foregoing constitutes the court's findings of fact and conclusions of law.

Settle judgment on notice.