Samuel CUNNINGHAM, Plaintiff-Appellee,

v.

ERIE RAILROAD COMPANY and The United Railroad Workers of America, Inc., C.I.O., Local 1463, Defendants-Appellants.

No. 219, Docket 30078.

United States Court of Appeals Second Circuit.

Argued Jan. 12, 1966.

Decided March 29, 1966.

Jerome T. Orans, New York City, for plaintiff-appellee.

J. Roger Carroll, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, on the brief), for defendant-appellant Erie R. Co.

Michael Klein, New York City (John F. O'Donnell and O'Donnell & Schwartz, New York City, on the brief), for defendant-appellant Local 1463, Railroad Division, Transport Workers Union of America, AFL–CIO.

Before LUMBARD, Chief Judge, and MEDINA and KAUFMAN, Circuit Judges.

MEDINA, Circuit Judge:

When this case was last before this Court, we reversed a dismissal for lack of subject matter jurisdiction and remanded for a new trial. Cunningham v. Erie R.R., 2 Cir., 1959, 266 F.2d 411. At that time we construed the complaint as alleging "hostile discrimination" and thus a breach of the duty of fair representation, see Steele v. Louisville & Nashville R.R., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, by Local 1463 in causing Cunningham to be discharged from his job; and violation of Section 2, Eleventh of the amended Railway Labor Act, 45 U.S.C. § 152, Eleventh, by the Erie Railroad in effecting the discharge under a union shop provision for a "reason other than the failure * * * to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of * * * retaining membership." On remand, the case was tried by Judge Bonsal without a jury. He found "hostile discrimination" by the Union and consequently a discharge by the Railroad in violation of the Railway Labor Act. Cunningham was awarded damages of $9,583, with interest, as against both defendants and, in accordance with the indemnity provisions of the collective bargaining agreement between the Union and the Railroad, judgment over was granted in favor of the Railroad against the Union for any damages the Railroad might be required to pay. Judge Bonsal's opinion is reported at 243 F.Supp. 571. We affirm.

I

Samuel Cunningham entered the employ of the Railroad in 1943 and in the Fall of 1954 was a ferryboat porter. The charge of "hostile" and "bad faith" discrimination by the Union grew out of events subsequent to Cunningham's loss of two weeks of employment in November, 1954. He had been "bumped" from

his position as senior "extra" porter and thought his seniority rights had been disregarded. We need not pause to consider the intricacies of the bidding for vacant positions, as they are fully described in the opinion below. What caused resentment on the part of Cunningham was the fact that a man named Smith, who was junior to Cunningham, wound up with an "assigned" job and Cunningham was unable to replace him.

While his limited 4th grade education made it difficult for Cunningham to understand how Smith was in and he was out, this did not prevent him from stirring up quite a rumpus, about which the Union in its brief and at the trial remained singularly silent. Thus, referring to the time he was "bumped" or "dismissed," Cunningham testified he called the Union because they had no Union representative on the job:

> I called practically every day and asked them to see about my seniority rights because they told me they had fellows working there who were younger than I was and I figured that I had a right to bump somebody but they said I couldn't bump nobody because I had no seniority rights because I was an extra man.

> Since they had taken away my seniority rights, I thought the union then should do something about it.

He kept after the Union people, reporting to them his conversations with Railroad representatives. "I wanted the Union to send somebody down. They had no shop steward or anybody to talk at the office for you or anything. I asked them to come down and do something." "I couldn't get no cooperation from the Union."

No witnesses were called by the Union to dispute any of this testimony. Moreover, despite the Union's assertion in the pretrial statement that Cunningham's actions "were motivated by his annoyance with the Union for its failure to process a grievance concerning his seniority rights, which the Union had investigated and found without merit,"

Henry Hengartner, the executive secretary of the Union, remembered no investigation. Indeed he even denied knowing anything about the seniority dispute with Cunningham in December, 1954. That he knew all about Cunningham's complaints on the subject of the failure of the Union to give him any cooperation, despite his denial, is made all too clear by Mr. Hengartner's testimony that he, the principal official of the Union, "was down on the property when the hearing date was up. Mr. Cunningham didn't show up." As Cunningham testified that, when he was demanding that the Union look into the matter of his seniority rights, "I couldn't get Hengartner, the Union man, over there to see about it," and as it is obvious that Judge Bonsal believed Cunningham vis-a-vis Hengartner, the inferences were all in favor of bad faith and "hostile discrimination" by the Union.

■ Thus there is a solid foundation in the proofs for the inference or finding by Judge Bonsal "that the Union was annoyed by reason of plaintiff's seniority claims." Nor would this inference be any the less compelling because it turned out, after some 52 pages of testimony on this complicated subject at two trials, that Cunningham's claims were unfounded. In any event, it was the primary responsibility of Judge Bonsal to draw inferences, as he had the advantage of seeing the witnesses and observing their demeanor as they testified. M. W. Zack Metal Co. v. S.S. Birmingham City, 2 Cir., 1962, 311 F.2d 334, cert. denied, 1963, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51; Allstate Ins. Co. v. Aetna Casualty & Surety Co., 2 Cir., 1964, 326 F.2d 871. We think it entirely reasonable to have inferred that Cunningham was a source of annoyance to the Union by his constant insistence that his seniority rights had been violated, even if in actuality they had not.

The theory of Cunningham's case is that the annoyance thus generated by his continuous complaints and his charges that the Union was not giving him any cooperation led the Union in bad faith

to decide to get rid of him. The proofs show that this was done in a way the Union officials probably thought was airtight and invulnerable. The Union by-laws provided that a member might be expelled from the Union if his dues for any one month were in arrears. In other words, the by-laws prescribed that dues were payable on the first of the month, but the employee could not be suspended from membership until he had been in arrears for 30 days. This was the Union proof at the first trial. But by the time of the second trial, discovery procedures had revealed what Judge Bonsal characterized as the "unusual treatment afforded the plaintiff in connection with his dues." On December 21, when the Union notified the Railroad by letter of the delinquency and requested a discharge proceeding for violation of the union shop agreement, Cunningham owed dues for October and November, a total of $4. The Local's by-laws make it clear that the December dues were not considered past due until December 31. It is undisputed that the Union had, at the time, a policy of not citing dues delinquents to the employer until at least three months dues were owing. Indeed, Hengartner, the Local's executive secretary, testified that there was a further practice of first sending a warning letter to the member himself, which was to "have a stipulated amount of time in it when he was to come up and pay up," this letter not being sent until the man was at least 3 months in arrears. Not until this request went unsatisfied was a citation sent to the employer.

In this case, however, Cunningham did not get such notification from the Union, and more importantly, he was not three months behind when the Union notified Erie to start discharge proceedings for violation of the union shop agreement. Moreover, for at least six of the weeks for which Cunningham was cited for not paying his dues, no attempt at collection had been made as to him. The normal procedure for collecting dues from ferryboat employees was for a shop steward to come around at irregular intervals and ask for the money. However, it was clearly established that during October and November of 1954 there was a hiatus of six weeks in which no shop steward was assigned to this task, and so Cunningham had no one to whom he could pay his dues.

Significantly, Union records introduced at the trial bear out the fact that considerable liberality—even much beyond the three months grace period—was practiced; for the dues day sheets indicate that other members were as much as eight months behind at times, without being cited to the employer. In fact, the record is replete with proof of numerous instances of dues delinquency by various members of Local 1463, including Cunningham. Many had been delinquent for longer periods than the three months erroneously ascribed to him, as is demonstrated in the Appendix to this opinion. And, in its recent history, no other man had been expelled from Local 1463 for non-payment of dues or fees.

It is true, as Judge Bonsal was aware, that this was the third time Cunningham was cited for dues delinquency within a thirteen-month period. But another Union member, McEntee, was cited three times within ten months during this same period and was given a last chance to pay up, a warning not extended to Cunningham. Obviously the policies of the Union in respect of dues delinquencies were haphazard and in no sense punitive or harsh in character, except for the "unusual" treatment afforded Cunningham.

Following the letter of December 21, 1954, notifying the Railroad that Cunningham had failed to comply with the union shop agreement "for reason that, has failed to continue payment of dues" (sic), Cunningham was summoned to the office of M. B. Roderick, the Railroad Superintendent, and was told that he must pay his dues within 24 hours. Roderick was not interested in hearing about Cunningham's seniority rights or about the fact that other marine workers were behind in their dues the same as he was, saying, "I'm not talking about the

others, I'm talking about you." The upshot was that on December 24, 1954, just 3 days after the date of the Union's letter, Roderick wrote stating that the Railroad had been informed that Cunningham had "failed to continue payment of dues," that the charge "if true, will result in your dismissal," and that Cunningham should demand a hearing in writing within 10 days if he disputed the charge.

Cunningham did not request a hearing, and on January 4, 1955 he was told by Roderick that he would be "out of service" as of the next day. On February 16, 1955, Roderick, after receiving approval from the Erie General Manager, notified Cunningham of his discharge, effective January 6, "account not complying with the Union Shop Agreement. Services otherwise rendered satisfactory."

In the interval between January 4, 1955, when Roderick told Cunningham he would be "out of service" as of the next day, and February 16, 1955, when, after receiving approval from the Erie General Manager, Roderick notified Cunningham of his discharge, effective January 6, 1955, Cunningham made two tenders of payment of the delinquent dues. In response to Cunningham's letter of January 13, 1955, the Union returned his check with a statement that he was no longer an employee of the Erie. His letter of January 26, 1955, together with the enclosed check, was returned unopened. Judge Bonsal referred to "the cavalier treatment accorded by the Union to the plaintiff when he sought to pay his dues on two occasions in January 1955 (prior to the receipt by him of the Railroad's notice of termination)" as one of the circumstances that led him to conclude that the Union did not forbear from "hostile discrimination." In view of what had taken place in December, 1954, as above described, we see no error here. In our opinion on the prior appeal we expressly noted that this tender would be too late "Assuming that there was no discrimination in Cunningham's dismissal" (266 F.2d at page 417).

II

The charge of "hostile discrimination" against the Union was abundantly proved. The effort to induce Judge Bonsal to decide that the Union just gave up on Cunningham as a dues-paying risk failed, not only because of the overwhelming proof of dues delinquencies by other workers, but because of the unique violation of the conceded policies of the Union in prematurely seeking his dismissal and the opportunity Judge Bonsal had to size up Cunningham as the very type of man who would make himself obnoxious to the Union by his continuous, although, as it finally turned out, unfounded, complaints about seniority. Indeed, it is highly probable that Cunningham does not yet understand how the system of seniorities, established and implemented by the Railroad, could possibly have resulted in his exclusion by a man who was his junior. And this record is devoid of any testimony by Union representatives that the Union made any effort to explain this curious result. The Union also failed in its efforts to divert attention from the central issue by prolonged examination of witnesses on the subject of the bids for positions and the operation of the seniority rules. The central issue was "hostile discrimination" or not, and this issue could be and was decided against the Union, whether Cunningham's complaints were or were not found to be justified.

Nor is there any issue here on the subject of the right of the Union, absent "hostile discrimination," to apply its dues delinquency policies in a flexible and common sense way, taking occasional hardships or even mere laziness or inattention into consideration, as we held on the former appeal (266 F.2d at page 417). Thus, none of the N.L.R.B. cases cited by the Union are apposite. Standard Brands, Inc., 1951, 97 N.L.R.B. 737; North American Refractories Co., 1952, 100 N.L.R.B. 1151; Great Lakes District, Seafarers' International Union, 1964, 149 N.L.R.B. 1114. We perceive no danger, arising from our decision in this case, of deterring unions from pursuing liberal

dues delinquency policies, so long as such unions refrain, as they are required by law to refrain, from "hostile discrimination" and bad faith against individual members of their organizations.

■ We conclude that the charge of "hostile discrimination" and bad faith on the part of the Union was established by the application of the principles of law set forth in our opinion on the first appeal. Cunningham v. Erie R.R., 2 Cir., 1959, 266 F.2d 411, supra. See also Thompson v. Brotherhood of Sleeping Car Porters, 4 Cir., 1963, 316 F.2d 191; N. L. R. B. v. Biscuit & Cracker Workers Local Union, 2 Cir., 1955, 222 F.2d 573; Nobile v. Woodward, E.D.Pa., 1962, 200 F.Supp. 785.

■■ Once it is established, as here, that the expulsion of the worker from membership in the Union was the product of an act of "hostile discrimination" by the Union, that is to say "for any reason other than the failure of the employee to tender the periodic dues * * *uniformly required* as a condition of acquiring or retaining membership," 45 U.S.C. § 152, Eleventh (a) (emphasis added), the Railroad, having discharged the employee on the representation of the Union that he had failed to tender such periodic dues, uniformly required, is automatically liable for wrongful discharge. See Brady v. Trans World Airlines, D.C. Del., 1963, 223 F.Supp. 361. This is because the limited protection afforded by the Railway Labor Act is no longer available as a defense. See 45 U.S.C. § 152, Eleventh (d) and Fourth. It is probably because of such automatic liability that

collective bargaining agreements in this industry, including the one in the present case,[1] provide for indemnification by the Union for any and all liability arising from an unlawful discharge. See also Brady v. Trans World Airlines, D.C.Del., 1958, 167 F.Supp. 469. It is not necessary for the discharged employee to allege or prove that the Railroad participated in the "hostile discrimination." Compare Ferro v. Railway Express Agency, Inc., 2 Cir., 1961, 296 F.2d 847.

Other points urged by the Union and the Railroad may be disposed of briefly. There is no merit in any of them. It is claimed that Cunningham's case is different from others because he not only failed to pay his dues but "refused" to pay them. Judge Bonsal characterized this as "a play on words" and found "that his refusal was not final but was based upon his preoccupation over his seniority," and that Cunningham, "obviously a man of limited education," was "confused between the obligation to pay dues and the matter of his seniority rights."

■ It is claimed that Cunningham's case must be dismissed because he failed to demand a company hearing on the subject of the alleged "hostile discrimination" and thus did not exhaust his administrative remedies. But the letters themselves and the conversation with Roderick referred only to non-payment of dues. Roderick refused to permit Cunningham to speak on the subject of his seniority rights or the dues delinquencies of many of the other workers. Despite the statement in our former

---

1. Section VII
In the event that seniority and employment under the Rules and Working Conditions Agreement is terminated by the carrier under the provisions of this agreement, and such termination of seniority and employment is subsequently determined to be improper, unlawful, or unenforceable, the organization shall indemnify and save harmless the carrier against any and all liability arising as the result of such improper, unlawful, or unenforceable termination of seniority and employment; provided, however, that this section shall not apply to any case in which the carrier is the plaintiff or the moving party in the action in which the aforesaid determination is made or in which case the carrier acts in collusion with any employee; provided further, that the aforementioned liability shall not extend to the expense to the carrier in defending suits by employees whose seniority and employment are terminated by the carrier under the provisions of this agreement.

opinion to the effect that "it was common trade knowledge that the scope of this hearing was broad" (266 F.2d at page 416), it is clear from this trial record that Cunningham thought, and had good reason to think, that the hearing was to be held solely on the subject of his non-payment of dues, and that, as he knew he had not paid the dues, there was no point in demanding a hearing.

Affirmed.

## APPENDIX

The Union records introduced at trial indicate the following instances of dues delinquency among others, during 1953 and 1954:

| Date of Payment | Name | Number of Months of Delinquent Dues Covered by Payment | Number of Months Still Behind After Making Payment |
|---|---|---|---|
| January 30, 1953 | Perry | 3 | 3 |
| August 28, 1953 | McEntee | 4 | 1 |
| | Rodman | 5 | 2 |
| September 1, 1953 | Evans | 4 | None |
| September 25, 1953 | Wilcox | 4 | None |
| October 1, 1953 | McGrane | 4 | None |
| | Mundter | 4 | None |
| October 26, 1953 | Grace | 1 | 6 |
| October 28, 1953 | C. Willardsen | 9 | None |
| | J. Willardsen | 11 | None |
| December 24, 1953 | Flynn | 7 | 1 |
| April 14, 1954 | Aro | 4 | None |
| | Canriater | 3 | 1 |
| April 21, 1954 | Seabert | 4 | None |
| June 23, 1954 | Perry | 8 | None |
| June 29, 1954 | Collins | 5 | None |
| June 30, 1954 | Slatterly | 6 | None |
| | Clough | 6 | None |
| July 21, 1954 | McKenna | 7 | None |
| | Humenic | 4 | None |
| July 23, 1954 | Fumoniria | 4 | None |
| | Frank | 3 | 4 |
| | Ryan | 3 | 2 |
| | Sandomenico | 6 | 1 |
| September 7, 1954 | Daly | 4 | None |
| October 15, 1954 | McEntee | 1 | 3 |
| | Guberman | 4 | 1 |
| November 5, 1954 | Bell | 1 | 3 |
| | Thornton | 1 | 4 |
| November 15, 1954 | Keegan | 3 | 2 |
| December 7, 1954 | Martini | 3 | 1 |
| | McNice | 3 | 1 |
| December 22, 1954 | Errico | 3 | 1 |
| December 27, 1954 | Barbati | 2 | 2 |
| December 28, 1954 | McMahon | 3 | 1 |